UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCARLETT PIPKIN, | : | |
| | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **3:03CV0019 (MRK)** |
| | : | |
| **v.** | : | |
| | : | |
| BRIDGEPORT BOARD OF EDUCATION, | : | |
| SUPERINTENDENT SONIA DIAZ SALCEDO, | : | |
| in her official and individual capacities, | : | |
| ASSISTANT SUPERINTENDENT, KENNETH | : | |
| HENRICI, in his official and individual | : | |
| capacities, INTERIM MATHEMATICS | : | |
| DIRECTOR, RICARDO ROSA, in his official | : | |
| and individual capacities, GEAR UP | : | |
| DIRECTOR, LEROY DUPEE, in his official | : | |
| and individual capacities AND TEACHER, | : | |
| JORGE PEZO, in his official and individual | : | |
| capacities, | : | |
| | : | |
| **Defendants.** | : | **MARCH 17, 2004** |

**DEFENDANTS' STATEMENT
OF UNDISPUTED FACTS**

Defendants, Bridgeport Board of Education et al., by and through his undersigned

counsel, submits this statement pursuant to Local Rule 56 (a)1 in support of their Motion for

Summary Judgment.

1.     Plaintiff has been employed as a teacher by the Board for over thirty-two (32) years.

(Plaintiff Dep., pp. 28-31).

2.      During her employment with the Board, Plaintiff served as a Mathematics Resource Teacher for over twenty-three (23) years. (Plaintiff Dep., pp.30-31).

3.      Plaintiff is over 50 years old. (Plaintiff Dep., p. 119).

4.      Sonia Diaz Salcedo was and is the Superintendent of Schools for the City of Bridgeport. (Plaintiff Dep., p. 87).

5.      Kenneth Henrici was the Assistant Superintendent of Schools for the City of Bridgeport at all times relevant to the present case. (Plaintiff Dep., p. 6).

6.      Ricardo Rosa was the Interim Mathematics Director for the Board of Education of the City of Bridgeport at all time relevant to the present case. (Rosa Dep., pp. 6-7).

7.      Jorge Pezo was a Teacher for the Board of Education of the City of Bridgeport at all times relevant to the present case. (Pezo Aff., ¶ 5).

8.      During the 2000-2001 school year, Plaintiff participated in training for the Gear Up Program. (Plaintiff Dep., pp. 101-05).

9.      In May 2001, Plaintiff applied for a position in the Summer 2001 Gear Up Program. (Plaintiff Dep., p.107).

10.     On June 7, 2001, Plaintiff received a letter of rejection from Dr. Rosa for the Program. (Plaintiff Dep., p. 123)

11.     On or about June 21, 2002, Plaintiff received a letter from the Office of Human Resources requesting a meeting, which occurred on July 2, 2002. (Plaintiff Dep., p. 79).

12.     Gear Up is a school reform initiative which provides low income students with skills to enable them to get a post-secondary education. (Birks Aff., ¶ 4).

13.     The Gear Up Program includes the following: partnering with local school districts to initiate a systemic curriculum reform effort; implementation of a comprehensive professional development plan; development and delivery of parent programs; design and delivery of after-school programs focused on positive development; and coordination of mentoring and tutoring programs for academic support. (Birks Aff., ¶ 4).

14.     The Gear Up Program is designed to provide students with the necessary skills to be competitive in an Algebra program. (Dupee Dep., p. 6).

15.     At all time relevant, there was a concerted effort by Defendant Board to move Algebra I down to an 8th grade level. (Dupee Dep., p. 7).

16.     The Gear Up Program was initiated to achieve the objective of moving Algebra I down to an 8th grade level. (Dupee Dep., p. 8).

17.     The project, which covered certain schools in the cities of Bridgeport, New Haven and Hartford, involved six schools in Bridgeport. (Birks Aff., ¶ 5).

18.     Carol Birks, an employee of the State of Connecticut, Department of Higher Education, State Gear Up Project, held the position of Site Coordinator at all times relevant to the instant case. (Birks Aff., ¶ 3).

19.     Defendant also received a grant to initiate a Gear Up Program and, as a result, administered it in another seven schools. (Birks Aff., ¶ 6).

3

20. Kathleen Gombos coordinated Defendant's Gear Up Program that was the partnership between Defendant and the State. (Gombos Aff., ¶ 2).

21. At all times relevant to Plaintiff's claims in connection with the Summer 2001 Gear Up program, she was in a non-classroom assignment as a Mathematics Resource Teacher in the Mathematics Department and assigned to Blackham School. (Plaintiff Dep., pp.31, 98).

22. Plaintiff was supervised by Leroy Dupee, who served as Director of Mathematics, until his retirement in June of 2000. (Dupee Dep., p. 5).

23. The first summer session for the Gear Up Program took place in the Summer of 2000. (Dupee Dep. p. 8; Plaintiff Dep., p. 97).

24. Leroy Dupee served as a Director of the Gear Up Program and coordinated it for that Summer. (Dupee Dep., pp. 6-7).

25. Leroy Dupee was employed as a consultant with both the Board and State of Connecticut, Department of Higher Education. (Dupee Dep., pp. 5-6).

26. There was a posting to solicit candidates for the Summer 2001 Gear Up Program. (Dupee Dep., p. 8).

27. The Gear Up Program needed candidates who had the necessary skills to effectively deliver a quality program to students, based on a curriculum that was provided by the Bridgeport Board of Education, and who had the necessary skills to deliver that program. (Dupee Dep., p. 9).

4

28. The Gear Up Program for the Summer of 2000 received less applications than the number of slots that needed to be filled. (Dupee Dep., p. 9).

29. Plaintiff applied for the Summer 2000 Program and was hired. (Dupee Dep., p. 10).

30. Due to the insufficient number of candidates for the Summer 2000 Program, all teachers who applied were accepted. (Dupee Dep., pp. 10, 26-27).

31. The District also solicited candidates for the Summer 2000 Program from outside of the District and reposted the position with the District. (Dupee Dep., p. 32).

32. Teachers in the Summer 2000 Gear Up Program were expected to adhere to a certain curriculum, which was considered to be the minimal curriculum taught to students. (Dupee Dep., pp. 10-11; Exh. 2).

33. Leroy Dupee observed the classrooms in the Summer of 2000. (Dupee Dep., pp. 10-11).

34. He was physically in the classrooms at least three to four times during the duration of the Summer. (Dupee Dep., pp. 10-11).

35. When Leroy Dupee observed Plaintiff's classroom, he had concerns about her performance. (Dupee Dep., p. 11).

36. Leroy Dupee's primary concerns with Plaintiff's performance were the quality of the delivery of instruction and certain skills, particularly in the area of teaching the effective use of the graphing calculator, which was an integral component of the curriculum. (Dupee Dep., pp. 11-12).

37.     Leroy Dupee brought his concerns to Plaintiff's attention and made the recommendation that she seek some support and assistance.  (Dupee Dep., p. 12).

38.     Leroy Dupee was not satisfied with Plaintiff's performance in the Summer 2000 Gear Up Program.  (Dupee Dep., p. 33).

39.     Leroy Dupee told Plaintiff that quality of the delivery of instruction to students had to be improved.  (Dupee Dep., p. 35).

40.     In addition to Leroy Dupee's concerns with respect to the quality of Plaintiff's instruction, Leroy Dupee was dissatisfied with her refusal to carry out her responsibilities.  (Dupee Dep., p. 12).

41.     During the Summer of 2000, Leroy Dupee specifically asked Plaintiff to call the parents of students who did not show up for classes.  (Dupee Dep., p. 12).

42.     Plaintiff responded that she would not call the parents, that it was just not her job to do so.  (Dupee Dep, p. 34).

43.     Defendant Jorge Pezo had the day-to-day monitoring responsibility for the Summer 2000 Gear Up Program.  (Dupee Dep., p. 52).

44.     Leroy Dupee directed Jorge Pezo to also approach Plaintiff about contacting students, and he reported back that Plaintiff had given him the same response.  (Dupee Dep., p. 34).

45.    Plaintiff failed or refused to abide by Leroy Dupee's directive that she contact parents of students who did not show up for her classes in the Summer 2000 Gear Up Program. (Plaintiff Dep., p.104).

46.    While Plaintiff may have raised such points to Leroy Dupee in their meeting, "[h]e never said "Never mind; don't make the calls." (Plaintiff Dep, pp. 103, 105).

47.    Plaintiff made calls after the meeting, but she subsequently stopped. (Plaintiff Dep., pp. 103, 105).

48.    At the conclusion of the Summer 2000 program, Defendant Kenneth Henrici sent letters to everyone who participated in the program. (Dupee Dep., p. 13; Exh. 3).

49.    The letter sent by Kenneth Henrici to teachers in the Summer 2000 Program was not at Leroy Dupee's recommendation. (Dupee Dep., p. 13; Exh. 3).

50.    Leroy Dupee personally sent a letter of commendation to certain staff in the Gear Up Program of Summer 2000, in which he acknowledged appreciation for them administering the program at the level of expectation. (Dupee Dep., pp. 13-14; Exh. 4).

51.    The letter from Leroy Dupee was sent only to those individuals, who, in his professional opinion, administered the program the way it was designed to be administered. (Dupee Dep., pp. 13, 14; Exh. 4).

52.    Leroy Dupee did not send the letter to Plaintiff. (Dupee Dep., pp. 13-14; Exh. 4).

53.    The Gear Up Program was held again the Summer of 2001. (Dupee Dep., p. 15; Plaintiff Dep., pp. 106-107).

54.    There was a sizable increase in pay from the previous year.  (Dupee Dep., p. 15; Exh. 5).

55.    As in the prior summer, there was an application to solicit candidates for the Program. (Dupee Dep., p. 15).

56.    Plaintiff was one of many applicants for the Summer 2001 Gear Up Program.  (Dupee Dep., p. 15).

57.    The number of applicants for the Summer 2001 Gear Up Program was more than double the number of positions for the Summer 2001 program.  (Dupee Dep., p. 15, 55).

58.    A Teacher Selection Committee ("Committee") was formed in 2001.  (Dupee Dep., p. 16; Pezo Aff., ¶ 5; Birks Aff., ¶ 7; Gombos Aff., ¶ 4).

59.    The members of the Teacher Selection Committee were:

- Leroy R. Dupee, Program Director, retained by the State of Connecticut, Department of Higher Education, 58 years old (at that time), Black, African-American Male;
- Carol Birks, Gear Up Site Coordinator, employed by the State of Connecticut, Department of Higher Education, 33 years old (at that time), Black, African-American, Female;
- Kathy Gombos, Gear Up Site Coordinator, employed by the Bridgeport Board of Education, 33 years old (at that time), White, Female; and
- Jorge Pezo, Mathematics Curriculum Specialist, employed by the Bridgeport Board of Education, 39 years old (at that time), Hispanic, Male.  (Dupee Dep., p. 16; Pezo Aff., ¶ 5; Birks Aff., ¶ 7; Gombos Aff., ¶ 4).

8

60.    The Committee met to review applications, screen applicants and review recommendations, which were submitted to the Mathematics Department of Defendant Board. (Dupee Dep., p. 18; Pezo Aff., ¶ 5; Birks Aff., ¶ 7; Gombos Aff., ¶ 4).

61.    Each applicant's application was assessed individually by the Committee with respect to his or her knowledge, experience and ability to teach Algebra and Geometry. (Pezo Aff., ¶ 5; Birks Aff., ¶ 7; Gombos Aff., ¶ 4).

62.    The Committee was looking for candidates who could administer the Program effectively and possessed the necessary skills to do so. (Dupee Dep., p. 18; Pezo Aff., ¶ 5; Birks Aff.,¶ 7; Gombos Aff., ¶ 4).

63.    With respect to Plaintiff's application, Leroy Dupee provided his input to the Committee regarding her performance in the Gear Up Program during the Summer 2000 Program. (Dupee Dep., p. 18).

64.    Leroy Dupee recommended that the Committee vote "no" on whether to employ Plaintiff for the Summer 2001 Program. (Dupee Dep., pp 18-19; Pezo Aff., ¶¶ 10, 11; Birks Aff., ¶¶ 12, 13; Gombos Aff., ¶¶ 9, 10).

65.    Leroy Dupee advised the Committee that Plaintiff did not follow curriculum and that he discussed her failure to do so at that time. (Pezo Aff. ¶ 10; Birks Aff., ¶ 12; Gombos Aff., ¶ 9).

66.   Leroy Dupee further advised the Committee that Plaintiff failed to contact parents of students who did not show for classes, and when criticized for her failure to do so, Plaintiff stated it was not her job. (Pezo Aff., ¶ 10; Birks Aff., ¶ 12; Gombos Aff., ¶ 9).

67.   It was a round table voting process, with each member having a vote. (Dupee Dep., p. 18; Pezo Aff., ¶ 5; Birks Aff., ¶ 7; Gombos Aff., ¶ 4).

68.   No other Committee members commented or made a suggestion regarding Leroy Dupee's vote. (Dupee Dep., p. 19).

69.   Based upon Leroy Dupee's input, the Committee did not recommend Plaintiff for a position in the Summer 2001 Gear Up Program. (Pezo Aff., ¶¶ 8, 9, 11; Birks Aff., ¶¶ 10, 11, 13; Gombos Aff., ¶¶ 7, 8, 10).

70.   The decision of the Committee was unanimous. (Dupee Dep., p. 19; Pezo Aff., ¶ 8; Birks Aff., ¶ 10; Gombos Aff., ¶ 7).

71.   At or around the time of Plaintiff's application for the Summer 2001 Gear Up Program, Defendant Ricardo Rosa held the position of Assistant Director of Mathematics. (Rosa Dep., pp. 5-7).

72.   While Assistant Director, he generally had the responsibilities of both the Assistant and Director positions since there was no Director of Mathematics following Leroy Dupee's retirement. (Rosa Dep., pp. 5-7).

73.   At the time, his responsibilities included observing and evaluating teachers at the high school level as well as Mathematics Resource Teachers. (Rosa Dep., pp. 5-7).

74.   Leroy Dupee informed Ricardo Rosa of the selections for the Summer 2001 Gear Up Program and the two had conversations as to who had been selected. (Rosa Dep., pp. 48-51).

75.   Leroy Dupee told Dr. Rosa of comments about Plaintiff and other teachers. (Rosa Dep., pp. 48-51).

76.   Leroy Dupee also told Rosa that teachers were asked to call parents in 2000 because attendance was low and that Plaintiff said "it wasn't her job." (Rosa Dep., pp. 48-51).

77.   Dr. Rosa agreed to have his name on the letters sent to successful teachers as well as those who were not accepted. (Rosa Dep., pp. 22-24; Dupee Exhs. 6, 7).

78.   The letters were ultimately sent over Dr. Rosa's and Leroy Dupee's signatures with initials (Rosa Dep., pp. 22-24; Dupee Dep., pp. 19-20, Exhs. 6, 7).

79.   Plaintiff subsequently filed a grievance to challenge the denial of the Summer 2001 position. (Plaintiff Dep., pp. 111-113).

80.   The grievance was presented to Defendant Kenneth Henrici, the Assistant Superintendent who oversaw the Gear Up Program that year. (Plaintiff Dep., p. 120).

81.   A diverse group of individuals taught in the Summer 2001 Gear Up Program. (Rosa Dep., Exh. 8).

82.   Of the applicants hired, there were three Black females, six White females, two White males and one Asian male. (Rosa Dep., Exh. 8).

83.    The three Black female teachers are each over 50 years of age: Carolyn Coleman (55), Ruth Garth (52) and Freddie McReynolds (69). (Rosa Dep., Exh. 8).

84.    Plaintiff was assigned to Blackham School as a Mathematics Resource Teacher during the 2001-2002 school year. (Plaintiff Dep., p. 31).

85.    John Perachio was appointed as Principal in January 2002. (Perachio Aff., ¶ 3).

86.    During his tenure in the 2001-2002 school year, John Perachio met with Plaintiff to discuss his performance expectations. (Perachio Aff., ¶ 6).

87.    The record reflects that in or around early February 2002, John Perachio met with Plaintiff to convey the expectation that as a Mathematics Resource Teacher she should hold five workshops. (Plaintiff Dep., p. 50).

88.    John Perachio made clear that Plaintiff must submit lesson plans, which are required by District policy. (Plaintiff Dep., p. 68).

89.    John Perachio also requested that Plaintiff submit a Mathematics budget for Blackham School for his review and approval and subsequently directed her to reduce it because funding was cut. (Plaintiff Dep., p. 49).

90.    Plaintiff failed to conduct the required number of workshops. (Plaintiff Dep., pp. 58-59).

91.    Plaintiff did not express to John Perachio that she did not have the skills or training to present Institute of Learning workshops. (Plaintiff Dep., p. 60).

92.     With respect to the Mathematics budget, despite John Perachio's instruction, Plaintiff submitted a budget without significant decreases. (Perachio. Aff., ¶ 7; Plaintiff Dep., p. 48).

93.     After Plaintiff made only minimal cuts to the budget, Perachio advised her that they were insufficient and requested that she make further reductions. (Perachio Aff., ¶ 7; see Plaintiff Dep., p. 48).

94.     Plaintiff refused to further reduce the budget as directed by John Perachio. (Plaintiff Dep., p. 49).

95.     John Perachio advised Plaintiff of his concern with her relationship with colleagues and sent letters to her regarding them. (Perachio Aff., ¶ 7; Plaintiff Dep., pp. 60-61).

96.     John Perachio wrote a letter to Plaintiff stating that a number of teachers said she was rude and intimidating and that she should keep in mind that they must work together. (Plaintiff Dep., pp. 60-61).

97.     John Perachio was dissatisfied with Plaintiff's performance. (See Plaintiff Dep., Exh. 4).

98.     In her summative Performance Appraisal for the 2001-02 school year, John Perachio identified Plaintiff's performance deficiencies. (Plaintiff Dep., pp. 64-67; Exh. 4, attached 2001-02 Performance Appraisal).

99.     Plaintiff left Blackham School that day, never to return, and refused to submit documentation in support of her absence for the rest of the year. (Plaintiff Dep., p. 66; Perachio Aff., ¶ 5e).

100.  Plaintiff maintained her refusal to provide the required documentation despite further requests made by John Perachio in the subsequent school year. (Plaintiff Dep., p. 136).

101.  Plaintiff filed a grievance to challenge her 2001-02 Performance Appraisal. (Plaintiff Dep., p. 91).

102.  The Union represented her in the process. (Plaintiff Dep., p. 92).

103.  Assistant Superintendent Henry Kelly, who is African American, heard Plaintiff's grievance. (Plaintiff Dep., p. 92).

104.  Henry Kelly denied the grievance and upheld the Performance Appraisal with the sole exception that Recommendation No. 5 be stricken. (Plaintiff Dep., p. 92).

105.  While Henry Kelly agreed that Plaintiff should not be required to substitute for absent math teachers, no other aspect of the Appraisal was changed. (Id.).

106.  Teachers holding a non-classroom assignment, are entitled to the same contractual rights, salary and benefits as those who are assigned to a classroom. (Pannozzo Dep., p. 44; Exh. 5).

107.  The classroom assignment is not a demotion in relation to a non classroom assignment. (Pannozzo Dep., p. 45).

108.  During the course of the 2001-2002 school year, the District decided to eliminate the Mathematics Resource Teacher assignment as it was initially developed and create the assignment of Numeracy Coach. (Pannozzo Dep., p. 50).

109.  Similarly, the District decided to eliminate the Reading Specialist assignment and create a Literacy Coach. (Pannozzo Dep., pp. 55-56).

110.  The Literacy Coach was created with the same change in focus. (Pannozzo Dep., pp. 55-56).

111.  In June 2002, Defendant Salcedo transferred several teachers from the non-classroom assignments of Reading Specialist or Mathematics Resource Teacher to a classroom assignment. (Pannozzo Dep., p. 55).

112.  Plaintiff was one of four Mathematics Resource Teachers who were transferred. (Plaintiff Dep., pp.9-10, 79; Pannozzo Dep., p.55).

113.  The other teachers, Angelo Cordone, Ann Brennan and Mary Walker, are White. (Pannozzo Dep., p. 55; Exh. 9).

114.  With respect to the group of Reading Specialists, four are white, and one is Hispanic. (Pannozzo Dep., p. 55; Exh. 9).

115.  The teachers who were transferred initially met with Defendant's Executive Director of Human Resources, Carole Pannozzo, to be notified of their transfer and to discuss their preferences regarding grade level, subject and school assignment. (Pannozzo Dep., p. 55).

116.  Plaintiff and Mary Walker, along with a Union representative, met with Carole Pannozzo on July 2, 2002. (Pannozzo Dep., pp. 85-88).

117.    In that meeting, Carole Pannozzo advised them that pursuant to a directive of the
        Superintendent, they would be assigned to a classroom for the 2002-2003 school year.
        (Pannozzo Dep., p. 22).

118.    Carole Pannozzo showed Plaintiff and Mary Walker the current list of vacancies
        throughout the District and gave them a copy so that they could review the opportunities,
        of which there were several, to transfer to an assignment of their choice.  (Pannozzo
        Dep., p. 23).

119.    Carole Pannozzo requested that they evaluate the positions that the Board had available
        and call if there was a position of interest.  (Pannozzo Dep., p. 23).

120.    The vacancy list is updated during the Summer based upon teacher transfers and
        resulting vacancies and subsequent listings are sent to schools via e-mail and posted.
        (Pannozzo Dep., pp. 46-48).

121.    During that meeting, Carole Pannozzo also told Mary Walker that she had recently
        spoken with Dr. Rosa who indicated that she might want to go to Read School.
        (Pannozzo Dep., p. 46).

122.    Plaintiff subsequently stopped into Human Resources and told Carole Pannozzo that she
        was going to apply for a position at Central High School.  (Pannozzo Dep, p. 27).

123.    However, in subsequent conversations, Plaintiff informed Carole Pannozzo that she
        would be taking a position at Barnum School.  During the discussion, Plaintiff did not

indicate dissatisfaction with the position or state that she wanted a different position. ((Pannozzo Dep,. pp. 55-56).

124. There was a Math Teacher position available at Central High School. (Plaintiff Dep., pp. 143-44).

125. There was a Math Teacher position available at Wilbur Cross School. (Plaintiff Dep., pp. 143-44).

126. There was an opening for a Math Resource Teacher at Roosevelt School. (Plaintiff Dep., pp. 143-44).

127. However, she decided against other positions and finally called Barnum School. (Plaintiff Dep., pp. 89-90).

128. The Principal was happy to take her, and she informed Carole Pannozzo that she would be going to Barnum School, Sixth Grade. (Plaintiff Dep., pp. 89-90).

129. Plaintiff could have chosen a Math position at Central High School or Harding High School, but did not seek an interview at either school. (Plaintiff Dep., pp. 143-144).

130. Plaintiff could have pursued a Math position at Roosevelt High School and did not seek an interview. (Plaintiff Dep., p. 144).

131. Had Plaintiff chosen a math teaching position, she would not need to teach other subjects such as Social Studies and Reading, which are part of the responsibility in her current grade at Barnum School. (Plaintiff Dep., p. 146).

132. After teaching at Barnum School for the 2002-03 school year, Plaintiff did not request a transfer to any other school, nor did she explore in any way whether there was a vacancy in Math in a different grade level. (Plaintiff Dep., p. 146).

133. Plaintiff was one of several teachers who filed a grievance regarding the involuntary transfer. (Plaintiff Dep., pp. 9-10).

134. The grievances were ultimately settled during the grievance arbitration process, and the grievant teachers were offered reassignment to Numeracy Coach positions. (See Plaintiff Dep., p. 95).

135. Plaintiff was offered a Numeracy Coach assignments at Maplewood School and Edison School. (Plaintiff Dep., p. 95).

136. Plaintiff declined both Numeracy Coach assignments. (Plaintiff Dep., pp. 95-96).

137. It would be Plaintiff's desire to return to Blackham School with John Perachio still the Principal of Blackham School. (Plaintiff Dep., p. 96).

Done at Bridgeport, Connecticut, this 17th day of March, 2004.


                           *Lisa M. Grasso*

LISA M. GRASSO, ESQ.
Federal Bar No. ct03768
DURANT, NICHOLS, HOUSTON,
HODGSON & CORTESE-COSTA, P.C.
1057 Broad Street
Bridgeport, CT 06604
(203) 366-3438

ATTORNEYS FOR DEFENDANTS
SONIA DIAZ SALCEDO, KENNETH HENRICI,
RICARDO ROSA & JORGE PEZO

## CERTIFICATION

I hereby certify that a copy of the foregoing was caused to be served this 17th day of March 2004, via U. S. Mail, Certified Mail, Return Receipt Requested, to the following counsel and pro se parties of record:

> W. Martyn Philpot, Jr., Esq.
> Law Office of W. Martyn Philpot, Jr., LLC
> 409 Orange Street
> New Haven, CT  06511

*Lisa M. Grasso*
Lisa M. Grasso

P:\lit\LMG\091200\377\00038855.DOC

20