# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SCARLETT PIPKIN            \*
        *Plaintiff,*       \*
                        \* CIVIL NO.  3:03CV0019 (MRK)

VS.                    \*
                   \*

BRIDGEPORT BOARD OF     \*
EDUCATION ET AL.         \*
        *Defendant.*     \* APRIL 28, 2004

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S ~~MOTION IN~~ OPPOSITION
## TO MOTION FOR SUMMARY JUDGMENT

      The plaintiff, Scarlet Pipkin hereby respectfully objects to defendant's Motion for

Summary Judgment, dated March 17, 2004.  Plaintiff maintains there are sufficient

genuine issues of material fact contained in the record to warrant submission of her

employment discrimination and emotional distress claims.   The factual and legal basis

is more fully set forth in the attached Memorandum of Law, Exhibits and Local Rule

56(a)2 Statement respectively.

      WHEREFORE, based on the foregoing, the plaintiff respectfully requests

defendant's Motion for Summary Judgment be denied in its entirety.

                PLAINTIFF, SCARLETT PIPKIN

         BY:
               Marc L. Glenn
               Law Office of
               W. Martyn Philpot, Jr., L.L.C.
               409 Orange Street
               New Haven, CT  06511-6406
               Tel. No. (230) 624-4666
               Federal Bar No. 21369
               Her Attorneys

2

## <u>CERTIFICATION</u>

*THIS IS TO CERTIFY* that a copy of the foregoing was mailed, postage prepaid, this date, to all counsel of record as follows: Pamela J. Coyne and Lisa M. Grasso, Durant, Nichols, Houston, Hodgson & Cortese-Costa, P. C., 1057 Broad Street, Bridgeport, CT 06604.

_____
Marc L. Glenn

s:\docs\employ\pipkin.memo.of.law.4-20-04

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| SCARLETT PIPKIN | * |
| *Plaintiff,* | * |
| | * CIVIL NO.  3:03CV0019 (MRK) |
| VS. | * |
| | * |
| BRIDGEPORT BOARD OF | * |
| EDUCATION ET AL. | * |
| *Defendant.* | * APRIL 28, 2004 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION
TO MOTION FOR SUMMARY JUDGMENT**

I.      STATEMENT OF FACTS

A.      **Plaintiff's Background**.

Scarlett Pipkin ("Pipkin") is a 56 year old African-American female.  Pipkin graduated from South Green High School in Snowhill, North Carolina in 1964.  (Ex. 1 at 19).  Pipkin received her Bachelor of Science Degree from North Carolina Central University in 1968.  Pipkin majored in home economics with a specialization in Child Development as well as a minor in Sociology.  *Id.* Pipkin went on to earn a Masters Degree from the University of Bridgeport in 1972;.  Currently, Pipkin holds a professional certification concerning kindergarten through grade 8 and Mathematics grades 7-12.  *Id.* at 20.  Pipkin started her teaching career with the Hall Neighborhood House in 1968 as a pre-school teacher.  Upon earning her certification Pipkin began with the Bridgeport Board of Education ("BOE") in 1970.  Throughout her tenure with the BOE, Pipkin has augmented her experience by serving as coordinator with several after-

2

school programs based in the City of Bridgeport.[1]

Pipkin served as a classroom teacher for the period 1970-1979. As such, Pipkin was responsible for teaching a variety of subjects, including math, reading, writing and social studies (Ex. 1 at 33-35). In 1979, Pipkin was one of the first BOE employees selected as a Math Resource Teacher ("MRT"). (Ex. 1 at 36). Pipkin began her career as a MRT at the John Winthrop School. The MRT position targeted professional development in student achievement in a core subject. Pipkin remained at Winthrop through 1982. She then began her tenure as an MRT at Florance Blackham School ("Blackham"). (Ex. 1 at 36). Pipkin remained at Blackham for the next 19 years. (*Id.* at 37). During much of Pipkin's service as an MRT, she was supervised and evaluated by the BOE's Director of Mathematics, Leroy Dupee ("Dupee"). Dupee's responsibilities as Director of Mathematics entailed curriculum development; professional development and performance appraisals including those of Pipkin. (Ex. 2 at 32).

As Director of Mathematics, Dupee submitted written performance appraisals concerning Pipkin from 1980-2000. (Ex. 10). Pipkin consistently performed at the level required of the BOE: "based on the duties and responsibilities of Mrs. Pipkin as a Math Resource Teacher, which was to administer a remedial program to students primarily in

---

In 1970, Pipkin served as coordinator for a Project Extend through the Action for Community Development of Bridgeport; Pipkin also coordinated the Lighthouse Program based in Bridgeport's Longfellow School for the period 1998-99. In addition to serving as co-coordinator of the Lighthouse Program, Pipkin served as an instructor for six months. (Ex. 1 at 22-23).

3

the lower grade, she performed at a satisfactorily level; she met the standards that were set by the Board of Education. (Ex. 2 at 34).

**B.     The Gear Up Program**

Beginning in the 1999-2000 school year, Pipkin commenced training for the Fall and Summer components of the Gear-Up Program ("Program"). The Gear-Up Program was funded in part by the State of Connecticut Department of Education ("DOE") and administered by several municipalities throughout the State of Connecticut. (Ex. 5). The Gear-Up Program has as its focus both remediation and enrichment. The remediation component targeted students in grades 7 and 8 for their preparation and aptitude in mathematics, specifically Algebra I. The enrichment component entailed laying the foundation for students to envision and work toward post-secondary education (Ex. 5); (Ex. 2 at 7, 8); (Ex. 1 at 113).

The program included Dupee as Director for the 1999-00 orientation and training Summer 2000 and 2001. Cathy Birks (Birks") as coordinator and Kathy Gombos ("Gombos") as liasion between the BOE and DOE respectively. As stated, *supra,* Pipkin began the training process for the Gear-Up Program in the Fall 1999. In May 2000, the job description and position were officially posted. Program's duration lasted for approximately eight weeks through July and August in the Summer of 2000. Instructors were compensated in the amount of $2,079.00. (Ex. 2 at 8-10); (Ex. 18). The applicant pool initially was limited to the Bridgeport district. However, applicant response was slow. An additional 4-5 slots remained vacant. (Ex. 2 at 11). Consequently, all applicants for Summer 2000 were selected as instructors without a review process. (*Id.*)

4

The Summer 2000 program utilized a variables and patterns instruction module with a curriculum that highlighted graphing skills. (Ex. 17). Each instructor implemented the curriculum to a group of ten to twelve students. However, each of the three instructors at Blackham encountered inconsistent attendance. Dupee requested that the instructors follow-up with phone calls to the absent student's home. (Ex. 2 at 14); (Ex.1 at 119-20). Pipkin dutifully followed up pursuant to Dupee's directive. Upon making the calls, Pipkin discovered that two of the students had gone to Florida for a vacation. A third student went to Jamaica for a vacation. Pipkin informed Dupee of the reasons for the students' absence. She deemed additional attempts futile. Moreover, the program also had a counselor on-site to investigate and follow-up on truancy issues. (Ex. 1 at 120).

During the course of the Summer 2000 program, Dupee conducted classroom observations of the instructors including Pipkin. Dupee states that he was concerned with Pipkin's delivery of the curriculum as illustrated in the graphing calculator exercises. Dupee addressed his concerns with Pipkin on one occasion. (Ex. 2 at 39). It was agreed that Pipkin's students would be referred to a fellow instructor to implement the instruction regarding the graphing calculator only. (*Id*); Notably, the arrangement resulted in minimal, if any, disruption to the delivery of the program's curriculum:

> [T]here are small groups. They weren't twenty five, thirty kids in a classroom. They were relatively small groups so if I recall there are about maybe twelve kids in each class. So putting two classes together did not create an inordinate hardship on the teacher *per se*, and the other teacher was willing to accept them in there. So it worked out.

5

(Ex. 2 at 39).

Moreover, Dupee never engaged in any follow-up observations to gauge any improvement by Pipkin related graphing calculator exercises. *(Id.* At 41). Significantly, Dupee did not have any concerns regarding Pipkin's proficiency to deliver the program's curriculum based upon his prior knowledge of Pipkin's professional competence. *(Id.* At 42). Ultimately, the success of Gear-Up is measured by the students' enrollment in Algebra I the following school year. *(Id.).* To Dupee's knowledge Pipkin's students were recommended for Algebra I for 2000-01. *(Id.* at 62).

While the Summer 2000 was the program's inaugural year, changes in its implementation were made for the Summer 2001. In May 2001 a job posting was distributed throughout the district. Moreover, it included a significant increase in compensation, in the amount of $3,360.00 . (Ex. 19). Consequently, the number of applicants surpassed the number of slots, thereby prompting a selection process. By the time the Summer 2001 program was commenced, Dupee retired from his position as Director of Mathematics from the BOE. He now supervised the program in his capacity as a consultant with the DOE. (Ex. 2 at 6). Dupee was replaced by Dr. Ricardo Rosa ("Rosa"), as the Director of Mathematics for the BOE. (Ex. 2 at 27); (Ex. 4 at 5). Upon garnering applications, they were forwarded to the program's selection committee comprised of Dupee, Birks, Gombos. Upon review of an applicant's credentials, names were forwarded to Rosa for recommendation for hiring. Recommendations were made after a majority vote by the Selection Committee, based upon a majority vote by the selection committee. (Ex. 2 at 27); (Ex. 4 at 22-24).

6

Pipkin applied for the Summer 2001 program. Moreover, Pipkin continued as an instructor for the program in the Fall 2000 with Dupee's full knowledge. (Ex. 1 at 150). Nonetheless, based upon Dupee's recommendation, Pipkin was not offered an instructor's position for Summer 2001. (Ex. 2 at 21); (Ex. 8). Notably, Pipkin was the only MRT not hired for Summer 2001. Additionally, Pipkin had the highest degree of seniority and level of certification than those applicants accepted for the Summer 2001 (Ex. 8).

### C.    Pipkin's Performance At Blackham and the Involuntary Transfer

Pipkin competently and professionally served as a MRT at Blackham for 19 years as corroborated by Dupee's evaluations during his tenure as Director of Mathematics. (Ex. 10). Subsequent to Dupee's retirement, the responsibility of conducting annual or summertime evaluations were conferred to the school principal . (Ex. 4 at 7). In January 2003, John Perachio ("Perachio") was appointed Principal at Blackham following the retirement of his predecessor John Kovacs. Perachio then commenced to take issue with Pipkin's performance as an MRT. Namely, Perachio questioned the number of workshops conducted by Pipkin. Additionally, he raised concerns over Pipkin's tone and demeanor when interacting with teachers at Blackham. (Ex. 1 at 71-72); (Ex. 22).

Perachio concerns were ultimately noted in the evaluation he completed at the end of school year 2001-2002. (Ex. 11). An evaluation that Pipkin disputed and ultimately filed a grievance pursuant to the governing Collective Bargaining Agreement, ("CBA"); (Ex. 1 at 155-60). Ultimately, the tensions between Perachio's scrutiny

7

resulted in Pipkin seeking a medical leave of absence in the latter part of May 2002.(Ex. 1 at 73).   During the 2002 summer recess, Pipkin received a letter from Carrole Pannozzo, ("Pannozzo") Director of Human Resources for the BOE.  Pannozzo requested a meeting with Pipkin regarding her placement for school year 2002-2003. (Ex. 14).; (Ex. 3 at 18).

In June, 2002, Pipkin attended a meeting at Pannozzo's office with two of her MRT colleagues, Ann Walker ("Walker") and Angelo Cardone, ("Cardone"). Pipkin, Walker and Cardone were long term, tenured employees over the age of forty. Pursuant to the directive of Superintendent Salcedo,  all were to return to the classroom as teachers. The move constituted an involuntary transfer pursuant to the CBA, (Ex. 13 at §7.4.4.2.

Pipkin and her colleagues were asked to select from a list of vacancies provided by Pannozzo's office.  Upon choosing a listed vacancy, Pipkin was to contact the principal about the vacancy. An interview process ensued. (Ex. 3 at 31-33). Pipkin would no longer be an MRT or its successor, the numeracy coach. Beginning in 2002-2003, the MRT position was eliminated and re-crafted as numeracy coach . (Ex. 3 at 50-51). The numeracy coach position would focus on professional development of classroom teachers and provide a model for the classroom teacher in delivering effective instruction of the curriculum. (*Id.*); (Ex. 4 at 47-48). At the time of Superintendent's directive ordering the involuntary transfer, Pipkin was not considered for the position of numeracy coach anywhere in the district. Instead, Pipkin's choices were restricted to classroom positions for the elementary grade level.

8

Additionally, Pipkin returned to the classroom as a generalist in which she would teach all the core subjects. Ultimately, Pipkin chose the classroom teacher position at Barnum ("Barnum") (Ex. 22) School. Subsequently, after exhaustion of the grievance procedure pursuant to the CBA, Pipkin was offered the numeracy coach position at Maplewood and Edison schools respectively. (Ex. 1 at 110-11). Pipkin declined said positions.

## II.    ARGUMENT

### A. Standard of Review

*Rule 56(c) of the Federal Rules of Civil Procedure* provides that a court shall grant a Motion For Summary Judgment if the court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Knight v. United States Fire Insurance Company*, 804 F.3d 9, 11 (2ˢ Cir. 1986), *cert. denied,* 480 U.S. 932 (1987).

In considering a Motion For Summary Judgment, a court should not resolve disputed issues of fact, but assess whether there are any factual issues to be tried, while resolving all ambiguities and drawing all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-250 (1986). Thusly, the role of this court is rather than the to decide the issues, to determine whether there are any genuine issues of material fact to be tried. *Gallo v. Prudential Residential Services Limited Partnership*, 22 F.3d 1219, 1224 (2d. Cir. 1994).

Summary Judgment should not be granted if the dispute about a material fact is "genuine", that is, if the evidence is such that a reasonable jury could return a verdict for

9

a non-moving party. *Id.* To show such a genuine dispute, the non-moving party must provide sufficient evidence to allow a jury to return a verdict in her favor. *Id.* at 248. A material fact is one that would affect the outcome of the action under the governing substantive law. It is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. *Anderson* 477 U.S. at 248. In other words, summary judgment is only proper were reasonable minds cannot differ as to the meaning of the evidence presented. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d. Cir. 1991), c*ert. denied* 502 U.S. 849 (1991), and where the evidence is so one-sided that one party must prevail as a matter of law. *Anderson* 477 U.S. at 251-252.

In discrimination cases such as the instant action, the inquiry is whether or not the plaintiff's race and/or age caused the treatment complained of by the plaintiff. Particularly in cases of this type when an evaluation of an individuals motivations and/or state of mind is important, courts sparingly use the tool of summary judgment as juries generally have a unique advantage over judges in making these types of assessments. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d. Cir. 1998); *Gallagher v. Delaney*, 139 F.3d. 338, 342 (2d. Cir. 1998) (noting juries' possession of the "current real life experiences required in interpreting subtle perceptions and implicit communications).

**B.     Pipkin's Discrimination Claims Pursuant To 42 U.S.C. §§ 1981/1983; 42 U.S.C. §2000 e ("Title VII").**

Pipkin's employment discrimination claims arise from two (2) adverse actions: (1) failure to hire for the 2001 Gear Up Program and; (2) the involuntary transfer from the Math Resource Teacher position ("MRT") at Blackham School to a general classroom teacher of Barnum for the 2002-03 school year.   To the extent the

10

aforementioned adverse actions were issued due to Pipkins race. Pipkin has made claims under §§ 1981 and 1983 and 42 U.s. §2000e ("Title VII"). It is well settled that the burden shifting framework articulated in *McDonnell Douglas v. Green* 411 U.S. 792 (1973) is utilized by reviewing courts when considering § 1981 and 1983 claims asserted in the employment context.[2]

For purposes of a Title VII claim, Pipkin must establish: (1) she is a member of a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; (4) the circumstances under which the adverse action occurred give rise to an inference of discrimination. *Saint Mary's Honor Center v. Hicks,* 509 U.S. 502 , 506 (1993). The record is unconverted that Pipkin is an African-American female and, thus, is a member of a protected class. The BOE claims that Pipkin did not perform her job, both as an MRT and an instructor for Gear-Up satisfactorily. To the contrary, since 1979 Pipkin discharged her duties as an MRT professionally and competently as corroborated by the evaluations conducted by Dupee. (Ex. 10). Additionally, Pipkin successfully completed the training for the program during the 1999-2000 school year; served as an instructor for Summer 2000 and continued to serve as an instructor for the Fall 2000. (Ex. 1 at 112-14).

---

See *Williams v. State University of New York*, 633 F.Supp.1243, 1249 (1986). ("under §1981 a plaintiff's prima facie case may be established by satisfying the four part test,   or variation thereof, set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d. Cir. 1998). (establishing the Title VII analytical framework for employment discrimination claims pursuant to §1983).

11

Furthermore, it is clear that Pipkin suffered two adverse actions as contemplated by Title VII and its statutory corollaries. The failure to hire for Summer 2001 and the involuntary transfer for the 2002-03 school year are adverse actions as recognized by law. Adverse employment actions are defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hunt v. Rapides Health Care Systems, LLC*, 277 F.3d 757, 769 (5th Cir. 2001). Lastly, Pipkin was the only MRT not re-hired for summer 2001 program; the other MRTs were a white female and a Hispanic female. (Ex. 1 at 195 ); (Ex. 8). It is well settled that Pipkin's burden in establishing the prima facie case is *de minimis*. See *Byrnie v. Town of Cromwell Board of Education*, 243 F. 3d 93, 102 (2d Cir. 2001); *Brown v. Coach Stores Inc.*, 163 F. 3d 706, 710 (2d. Cir. 1998).

### 1)    BOE's Legitimate, Non-Discriminatory Reason and Pretext

Once Pipkin has established the prima facie case, she creates a rebuttable presumption of discrimination. The burden of production then returns to the BOE to articulate a legitimate, non-discriminatory reason for the adverse action(s). The BOE posits that the failure to rehire Pipkin for the Summer 2001 as well as the involuntary transfer for school year 2002-03 were justified due to Pipkin's alleged unsatisfactory performance. (Def. Brf. At 29-31). Under the *McDonnell Douglas* framework, the burden returns to Pipkin to establish that the articulated reasons are, in fact, pretext. In other words, Pipkin is still entitled to a reasonable inference of discrimination upon establishing that the BOE's articulated reasons are false. "Pretext may be shown by such

12

weaknesses, implausibilities, and inconsistencies, incoherencies, or contradictions in the defendant's proffered reasons for its actions that a reasonable person could rationally find them unworthy of credence and hence infer that defendant did not act for the asserted non-discriminatory reasons. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).

Regarding the Summer 2001 failure to hire, the BOE points to Dupee's concern of Pipkin's ability to implement the curriculum through proficient instruction. Specifically, Dupee's prime concern of Pipkin's proficiency related to instruction related to the graphing calculator. However, Dupee supervised the implementation of the program in the 1999-2000 school year, as Director of Mathematics. Math teachers, including MRTs, participated in training and orientation regarding Gear-Up. It is at that time prospective instructors were informed of the core curriculum. (Ex. 2 at 58-59); (Ex. 17). Moreover, Dupee based upon his performance evaluations of Pipkin during his tenure as Director of Mathematics, had no doubts that Pipkin had the required proficiency to implement the core curriculum as devised by the program. (Ex. 2 at 42). While Dupee was not certain whether individual instructors used traditional means, i.e., testing, in preparing the program students for Algebra I, he stated that all of the program's instructors utilized checkpoints to measure the student's aptitude. (Ex. 2 at 61).

Additionally, Dupee did not follow up on his observations of Pipkin relative to improvement in implementing the graphing calculator or use of the aforementioned benchmarks in preparing the program students. (*Id.* at 41, 61-62). Ultimately, Pipkin's

13

students were recommended and enrolled in an Algebra I curriculum for the Fall 2000.

Lastly, Dupee's allegations that Pipkin failed to call students who failed to attend the

Summer 2000 program is patently false. Pipkin followed through on Dupee's request

and discovered that three of her students were not attending the program as they were

away on vacation. (Ex. 1 at 119-20).

　　　　Of the accepted applicants for summer 2001, Pipkin had a higher degree of

certification, professional, than six (6) of the accepted white applicants. (Exs. 7 and 8).

These similarly situated applicants all held a provisional certification, a designation that

reflects their nascency. Indeed, Dupee acknowledged such during his deposition:

> A.　　Did length of service were that given any weight regarding
> 　　　　your selection process of a candidate.
>
> A.　　It was a factor.
>
> Q.　　To what degree sir?
>
> A.　　That we had a wonderful opportunity to make a real accurate
> 　　　　assessment in terms of that candidate's competence to
> 　　　　administer a program, it's, indeed an advantage to know a can-
> 　　　　didate over a longer period of time. (Ex. 2 at 56-57).

As it relates to certification Dupee noted:

> Q.　　Sir, in reviewing the selection criteria either for 2000 or 2001
> 　　　　what's the impact, if any, of certification.
>
> A.　　Certification and transcript is an indicator that one has gone
> 　　　　through the process of meeting certain requirements for teaching.
>
> Q.　　Would it indicate a level of proficiency?
>
> A.　　Well, in my years as Mathematics Supervisor, it is a practice of
> 　　　　the Board of Education to hire individuals based on state certifi-
> 　　　　cation...

*Id.* at 44.

14

Given Pipkin's thirty-two (32) year tenure with the BOE, her familiarity and participation in the Gear-Up program since its implementation in Bridgeport; and Dupee's knowledge of her competent and professional performance as a math teacher and MRT, a genuine issue of material fact is readily apparent regarding Pipkin's qualifications in comparison to six (6) of the accepted applicants for the summer 2001 program. "In a hiring or promotion case, one may be able to show that the person selected was less well qualified than the plaintiff."  See, *Lilly v. Harris-Teeter Supermarket,* 842 F.2d 1496 (4th Cir. 1988) (pretext established upon African American employee showing good work record, higher degree of education and experience and seniority over white counterpart).

Moreover, the CBA certainly presents a genuine issue of material fact as to whether the Gear-Up program is a "special school program" under which consideration of an "applicant's competence, major or minor field of study, certification and length of service in the system should be given full consideration when making selections." (Ex. 13 at §4.8-4.8.3).

The record is uncontroverted that although funded by the State DOE, Dupee and Pezo all implemented and supervised the program in their capacities as employees of the BOE. (Ex. 2 at 19).  Moreover, the record also reflects the program operated during the summer months of July and August and was a morning program.  (Ex. 2 at 54-55). Moreover, the BOE was imbued with hiring and firing decisions.  The Selection Committee made recommendations to Dr. Rosa,  Director of Mathematics.  Decisions to hire were then endorsed by the BOE through its Personnel Office. (Ex. 2 at 11, 20 at

15

lines 12-18).

Concerning Pipkin's involuntary transfer, Sec. 7.4.4.2 of the CBA governs the procedure and policy behind involuntary transfers. (Ex. 13). The stated policy provides "seniority will be respected, to the extent that it does not conflict with the instructional requirements and basic interests of the school system and its pupils." Moreover, §7 of the CBA goes on to state, "teacher assignments and transfers shall be made without discrimination in regard, creed, color, religion, nationality, sex or marital status." *Id.* Notably, Subsection B regarding involuntary transfers indicates that the teacher subject to such a transfer shall be notified of the reasons for the transfer. The record is clear that Pipkin was never advised of the reasons for her transfer by the Superintendent, Dr. Salcedo or her designees, in this instance, Panozzo. (Ex. 3 at 20). Moreover, the BOE has enacted and purports to enforce an anti-discrimination and Affirmative Action policy. (Ex. 12).

The BOE points to the diversity of the selected applicants for the Summer 2001 program. Additionally, they also highlight that the decision makers related to the adverse actions were also members of a protected class. However, "Title VII's principle focus is on protecting individuals rather than a protected class as a whole, an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members or the employees group favorably." *Graham v. LIRR*, 230 F. 3d 34, 43 (2d Cir. 2000); *Connecticut v. Teal*, 45 U. S. 440, 453-55 (1982); *EEOC v. Staten Island Savings Bank* 207 F. 3d 144, 151 (2d Cir. 2000).

Therefore, as genuine issues of material fact remain concerning pretext, summary

16

judgment must be denied.

### C. Pipkin's ADEA Claim

29 U. S. C. § 622, 623 ("ADEA") prohibits discrimination against employees who are at least 40 years old. The ADEA provides that it is unlawful for an employer: (1) to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to his or her compensation, terms, conditions or privileges of employment because of such individuals age; (2) to limit segregate or classify his or her employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee because of such individuals age or; (3) to reduce the wage rate of any employee in order to comply with the ADEA. *Id.*

To establish a prima facie case, Pipkin must again prove that she is a member of the protected class, performed her job satisfactorily suffered an adverse employment action and the adverse action occurred under circumstances that give rise to an inference of discrimination. *Stratton v. Department For The Aging for the City of New York,* 132 F.3d. 869, 878-879 (2d. Cir. 1997).

Much of the evidence offered to support Pipkin's ADEA claim has been stated in support of Pipkin's claims pursuant to Title VII and §§1981 and 1983 respectively. Pipkin relies on the argument as set forth, *supra,* in Sec. II.B. Nonetheless, the BOE points to the selections of Freddie McReynolds, age 69, black female and Ruth Garth, age 53, black female as examples of its non-discriminatory hiring practices. (Ex. 8).

17

However, the fact that an employer has hired a member of a protected class for the position at issue is not fatal. See, *EEOC v. Staten Island Savings Bank*, 207 F.3d 144, 151 (2d Cir. 2000). Of the twenty-one (21) successful applicants for Summer 2001, ten (10) were below the age of forty (40). (Ex. 8). At least two had no certification at all (Ex. 8: Carrano and Jones), an additional four (4) had a provisional certification. (Affie, Sevigny; Mayorga and Campbell). (Ex. 8).

Moreover, Pipkin's service as an MRT certainly provided an abundance of experience in implementing the math curriculum and a curriculum comparable to that required by Gear-Up. Notably of the known summer 2001 applicants who were also MRTs, Pipkin is the only not to be accepted for the summer 2001 program. (Ex. 8).; (Ex. 1 at 195). Lastly, to the extent the BOE derogated from its own policy and procedure as stated in Sec. 7 of the CBA in failing to give due consideration to Pipkin's length of service, certification and experience when selecting candidates for the summer 2001 program, a genuine issue of material fact remains as to whether the BOE's stated reasons for the adverse actions are pretextual thus supporting a reasonable and sustainable inference of discrimination.

Moreover, Pipkin's return to the classroom at Barnum School is sufficient to qualify as an adverse action. "A transfer is an adverse employment action under the ADEA if it results in a change in responsibilities so significant as to constitute a setback to the career." *Galabya v. New York City Board of Education*, 202 F.3d 636, 641 (2d Cir. 2000). The record is uncontroverted that Pipkin's position at Barnum is that of a classroom teacher whereby she delivers instruction to a large group of students on a full

18

time basis. Pipkin teaches a variety of core subjects. An adjustment as recognized by Rosa in that Pipkin has been away from full time classroom instruction for some nineteen (19) years. (Ex. 4 at 46). Lastly, it is curious to note that Pipkin was recommended for an involuntary transfer and returned to the classroom subsequent to Perachio's concerns and those of Dupee in his observations of Pipkin during Summer 2000; an issue that Panozzo found curious during her deposition. Such a change in placement would be detrimental to the students and staff at the new site. (Ex. 3 at 38-39). Thus, the question is raised why return an employee to the classroom who has allegedly exhibited a lack of proficiency in instructing and implementing curriculum, as well as interacting with colleagues, namely fellow teachers. (Ex. 11).

Accordingly, based upon the argument set forth in Subsection B, as well as in support of Pipkin's ADEA claim, the plaintiff respectfully submits that genuine issues of material fact remain as to whether the failure to hire for Summer 2001 and the involuntary transfer occurred under circumstances giving rise to a reasonable inference of discrimination. As such, Pipkin respectfully requests that summary judgment be denied.

**D.    Pipkin's Emotional Distress Claims**

1. Negligent Infliction Of Emotional Distress

Count Three of the Amended Complaint dated May 2, 2003 asserts allegations in support of negligent infliction of emotional distress. In the employment context, in order for a claim of negligent infliction of emotional distress can validly, Connecticut courts have held that a defendant will be held liable when it is determined that the

19

defendant should have realized that its conduct involved an unreasonable risk of causing

emotional distress and that distress if it were caused by result in illness or bodily harm.

*Montinieri v. Southern New England Telephone Company,* 175 Conn. 337, 345 (1978).

The BOE maintains that Pipkin's negligent infliction of emotional distress claim

must fail as she was never subject to a termination. (Def. Br. at 47). Nonetheless the

record is clear that the adverse actions at issue took its emotional toll on Pipkin. It is

reflected in Exhibit 16, Pipkin sought and received treatment related to depression as a

result of failure to hire for the Summer 2001, the involuntary transfer and Perachio's

disdain for her performance. Since June 2002, Pipkin has been treated by the Hall-

Brooke Health Services Center by Dr. Harland. (Ex. 16). The records clearly reflect

Pipkin developed depression and was prescribed Zoloft. It is the very condition that

resulted in Pipkin's medical leave of absence at the end of 2002. Even upon providing

the appropriate documentation to the BOE's Personal Office, Perachio continued to

harass Pipkin for documentation appropriately provided to the Personnel Office. (Ex. 1

at 154-158). Accordingly, Pipkin respectfully requests that summary judgment be denied

as to her claims of emotional distress.

    2. Intentional Infliction Of Emotional Distress

Count Two of the Amended Complaint alleges intentional infliction of emotional

distress. The prima facie case is as follows: (1) the actor intended to inflict emotional

distress or that he knew or should have known that the emotional distress was the likely

result of his conduct; (2) that the conduct was extreme and outrageous; (3) the defendants

conduct was the cause of the plaintiffs distress and (4) that the emotional distress

20

sustained by the plaintiff was severe. *Dollar v. Board Of Education*, 63 Conn. App. 550, 553-54 (2001). Typically the conduct of a party charged with intentional infliction of emotional distress exhibits behavior that makes the average community member recite "outrageous" upon hearing of the egregious conduct. The thrust of Pipkin's emotional distress claim is that her professional competence and integrity have been impugned. Pipkin maintains that the discriminatory conduct and mischaracterizations of her performance as illustrated in the failure to hire for the Summer 2001 and the subsequent involuntary transfer rise to the level to justify an exclamation of outrageous.

Upon commencing her performance as a classroom teacher at Barnum for the 2002-03 school year, Perachio continued to haunt and hunt Pipkin down in an attempt to resolve the 2002-03 summative evaluation. (Ex. 11). Perachio went as far as to have a Blackham security officer commute to Barnum, enter Pipkin's classroom while delivering instruction in an effort to obtain her signature on the evaluation. (Ex. 1 at 154-58).

Perachio then sanctioned a second visit by a Blackham security officer to Barnum which was intercepted by the main office at Barnum at Pipkin's request. (*Id.*). Significantly, by the fall of 2002, Pipkin had filed a grievance pursuant to the CBA regarding Perachio's evaluation. As the matter was in midst of the grievance procedure there was no need for Perachio to attempt to contact Pipkin through his designee. Moreover, Parachio's efforts to procure Pipkin's signature obviously proved disruptive to the educational process as on the first occasion the officer entered Pipkin's sixth grade classroom. (*Id.*).

21

Moreover, to the extent conduct that served as the basis for an intentional infliction of emotional distress claim is discriminatory, it may indeed be determined by a reasonable fact finder to be extreme and outrageous. *Collins v. Gulf Oil Corp.*, 652 F. Supp. 1519 (D. Conn. 1985). Lastly, all of the named defendants exert apparent and actual authority over the terms and conditions of Pipkin's employment. That dynamic has been recognized by courts when determining the sufficiency of allegations sounding in intentional infliction of emotional distress. "The extreme and outrageous character of the conduct may arise from a relation with the other, which gives him equal or apparent authority over the other, or power to affect his interests." See, *Mellaly v. Eastman Kodak*, 42 Conn. Supp. 17, 21 (1991), citing *Restatement of Torts*, (2nd) Sec. 46, Comment E.

Accordingly, Pipkin maintains there is sufficient evidence in the record for this court to determine, as a matter of law, that Pipkin's intentional infliction of emotional distress claim is viable and must be submitted to a trier of fact.

## CONCLUSION

In accordance with the arguments set forth herein, Pipkin respectfully requests that summary judgment be denied in its entirety as genuine issues of material fact remain as to whether she endured an adverse action, when denied an instructor's position for Summer 2001 and subject to an involuntary transfer in 2002-03. The non-discriminatory reasons offered for said actions are pretextual. Pipkin maintained a competent record of service for 32 years and continued to serve as a Gear-Up instructor after Summer 2000,

22

with Dupee's knowledge, coupled with evidence of younger, white similarly situated hirees for 2001, with lesser experience and level of certification, the record is unambiguous concerning pretext. Furthermore, the BOE strayed from its own procedures as it failed to give consideration to Pipkin's tenure and certification in accordance with the CBA.

Lastly, the record supports Pipkin's emotional distress claim as it the discriminatory conduct which prompted her depression and therapy sessions.

Accordingly, for all the reasons stated herein, Pipkin maintains summary judgment must be denied.[3]

---

Pipkin hereby withdraws her claims pursuant to United States Constitution Fourteenth Amendment and hostile work environment pursuant to Title VII.

23

PLAINTIFF, SCARLETT PIPKIN


BY: _____
        Marc L. Glenn
        Law Office of
        W. Martyn Philpot, Jr., L.L.C.
        409 Orange Street
        New Haven, CT 06511-6406
        Tel. No. (230) 624-4666
        Federal Bar No. 21369
        Her Attorneys



## CERTIFICATION

**THIS IS TO CERTIFY** that a copy of the foregoing was mailed, postage prepaid, this date, to all counsel of record as follows: Pamela J. Coyne and Lisa M. Grasso, Durant, Nichols, Houston, Hodgson & Cortese-Costa, P. C., 1057 Broad Street, Bridgeport, CT 06604.

_____
        Marc L. Glenn

s:\docs\employ\pipkin.memo.of.law:4-20-04