United States District Court
District of Connecticut
FILED AT        NEW HAVEN

Apr 28                          2004
Kevin F. Rowe, Clerk

By P. A. Villano
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| SCARLETT PIPKIN | * |
| *Plaintiff,* | * |
| | * CIVIL NO.  3:03CV0019 (MRK) |
| VS. | * |
| | * |
| BRIDGEPORT BOARD OF | * |
| EDUCATION ET AL. | * |
| *Defendant.* | * APRIL 28, 2004 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

A.    PLAINTIFF'S RESPONSE TO DEFENDANT'S RULE 56 (a)(1) STATEMENT

1.    Admitted
2.    Admitted
3.    Admitted
4.    Admitted
5.    Admitted
6.    Admitted in part.  Rosa served as Assistant Director of Mathematics from August 2000 to August 2001.  Rosa has served as Director since August 2001 to present. (Ex. 4 at 6-7).
7.    Admitted
8.    Admitted
9.    Admitted
10.    Admitted
11.    Admitted
12.    Admitted
13.    Admitted
14.    Admitted
15.    Admitted
16.    Admitted
17.    Admitted
18.    Admitted
19.    Admitted
20.    Admitted
21.    Admitted
22.    Admitted
23.    Admitted

2

| 24. | Admitted |
|-----|----------|
| 25. | Admitted |
| 26. | Admitted |
| 27. | Admitted |
| 28. | Admitted |
| 29. | Admitted |
| 30. | Admitted |
| 31. | Admitted |
| 32. | Admitted |
| 33. | Admitted |
| 34. | Admitted |
| 35. | Admitted |
| 36. | Admitted |

37. Denied. Assistance was relative to the graphing calculator only and was rendered by fellow instructor, without disruption. (Ex. 2 at 39).

38. Admitted

39. Denied. (Ex. 1 at 39 ).

40. Admitted

41. Admitted

42. Denied. Pipkin made calls on two occasions only to find that the absent students were away on vacation. (Ex. 1 at 119-20).

43. Admitted

44. Admitted only as to Dupee's request of Pezo only.

45. Denied. (Ex. 1 at 119).

| 46. | Admitted |
|-----|----------|
| 47. | Admitted |
| 48. | Admitted |
| 49. | Admitted |
| 50. | Admitted |
| 51. | Admitted |
| 52. | Admitted |
| 53. | Admitted |
| 54. | Admitted |
| 55. | Admitted |
| 56. | Admitted |

57. Denied. (Ex. 7)

| 58. | Admitted |
|-----|----------|
| 59. | Admitted |
| 60. | Admitted |
| 61. | Admitted |
| 62. | Admitted |
| 63. | Admitted |
| 64. | Admitted |
| 65. | Admitted |

3

66. Admitted
67. Admitted
68. Admitted
69. Admitted
70. Admitted
71. Admitted
72. Admitted
73. Admitted
74. Admitted
75. Admitted
76. Admitted
77. Admitted
78. Admitted
79. Admitted
80. Admitted
81. Admitted
82. Admitted
83. Admitted
84. Admitted
85. Admitted
86. Admitted
87. Admitted
88. Denied. As to submitting lesson plans were district policy. (Ex. 1 at 81-83).
89. Admitted
90. Admitted
91. Denied. Pipkin did not have training related to BEST practices. Pipkin's training was received from the Academy of Math and Science. (Ex. 1 at 91).
92. Denied. (Ex. 1 at 56-58).
93. Denied
94. Denied
95. Admitted
96. Admitted as to Perachio's statement only.
97. Admitted
98. Admitted
99. Denied.  Basis for budget dispute was Pipkin's claim that calculators were necessary and should not be subject to budget cuts.  (Ex. 1 at 56-58)
100. Admitted
101. Admitted
102. Admitted
103. Admitted
104. Admitted
105. Admitted
106. Admitted
107. Admitted as to Pannozzo's opinion only.

4

108. Admitted
109. Admitted
110. Admitted
111. Admitted
112. Admitted
113. Admitted
114. Admitted
115. Admitted
116. Admitted
117. Admitted
118. Admitted
119. Admitted
120. Admitted
121. Admitted
122. Admitted
123. Admitted
124. Admitted
125. Admitted
126. Denied with supporting reason. (Ex. 1 at 111-12).
127. Admitted
128. Admitted
129. Admitted
130. Admitted
131. Admitted
132. Admitted
133. Admitted
134. Admitted
135. Admitted
136. Admitted
137. Admitted.


**B.      PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE**

1.      Leroy Dupee ("Dupee") served as Director of Mathematics for the

BOE during Pipkin's service as an MRT. Dupee conducted annual performance evaluations

of the plaintiff for the period 1980 through 2000. All of Pipkin's evaluations as conducted

by Dupee satisfactory as she met the district's expectations. (Ex. 10).

5

2.      Based upon Dupee's knowledge of Pipkin's performance as both a classroom instructor and an MRT, Dupee was confident that Pipkin could implement the curriculum for the Gear-Up Program.  (Ex. 2 at 42).

3.      Beginning in school year 1999-2000, Pipkin enrolled and completed training for the Gear-Up Program. (Ex.1 at 112-13).

4.      For the summer 2000 program, Pipkin instructed ten to twelve students in their preparation for Algebra I for the fall of school year 2000-2001. (Ex. 2 at 39).

5.      Based upon a classroom observation, Dupee confronted Pipkin regarding instruction as to teaching the students use of the graphing calculator, a component of the program's core curriculum. (Ex. 2 at 39).

6.      Dupee suggested that Pipkin utilize a colleague conducting instruction related to the graphing calculator.  Due to the small number of students, there was no inconvenience or hardship on any of the instructors at Blackham. (Ex. 2 at 39).

7.      As summer 2000 was the first year of the program, attendance fluctuated for all instructors.  Dupee requested that the instructors, including Pipkin, phone the home of absent students to encourage their participation.  (Ex. 2 at 14; Ex. 1 at 119-20).

8.      Pipkin followed Dupee's directive and made calls on two occasions. Pipkin was informed by the absent students that they had proceeded to go on summer vacation and would not return in time for completion of the summer 2000 program.  Pipkin informed Dupee of her phone calls and indicated that further attempts would be futile.  (Ex. 1 at 119-20).  Gear Up Program also has an on-site guidance counselor whose purview included attendance issues. (*Id*).

6

9.      While the program had benchmarks to measure students' aptitude, the ultimate success of the program was measured by a recommendation that the students were enrolled in Algebra I for the following school year. (Ex. 2 at 61).

10.     To the best of Dupee's recollection, all students enrolled for the summer 2000 program, including Pipkin's students, were recommended for Algebra I for the school year 2000-2001. (Ex. 2 at 61).

11.     Pipkin continued to serve as an instructor for the Gear-Up Program throughout its fall component for school year 2000-2001 under Dupee's direction. (Ex. 1 at 112-14).

12.     For the summer 2000 and 2001 program, neither Dupee or Dr. Ricardo Rosa conducted or maintained formal performance evaluations (Ex. 2 at 42); (Ex. 3 at 17-18); (Ex. 20).

13.     Pursuant to the May 2001 posting, Pipkin applied for the summer 2001 instructor's position. Nonetheless, based upon a majority vote by the selection committee and at the strong recommendation of Dupee, Pipkin was not selected for the summer 2001 program. (Ex. 2 at 21-22); (Ex. 7); (Ex. 8).

14.     Non-protected class members accounted for one-third of the applicants for Summer 2001. (Exs. 7 & 8).

15.     Of the accepted applicants for Summer 2001, non-protected class members accounted for one-half of the filled instructor positions. (Ex. 8).

7

16.     Pipkin was joined by her fellow MRTs, Luc Butler, Bestina Peck, both

Hispanic and Bess Stites, a white female.  All of the aforementioned, except Pipkin, were

selected as instructors for summer 2001.  (Ex. 1 at 195); (Ex. 8).

17.     As a union member, Pipkin's terms and conditions of employment are

governed by a collective bargaining agreement, ("CBA") which establishes the conditions

for transfers either voluntary or involuntary.  (Ex. 13).

18.     During the summer recess 2002, Pipkin received a correspondence

from the BOE's Director of Human Resources, Carol Pannozzo requesting a meeting to

discuss placement for school year 2002-03.  (Ex. 1 at 99-102); (Ex. 3 at 17-20); (Ex. 14).

19.     On June 28, 2002, Pipkin attended a meeting with her fellow

colleagues, Anne Walker and Angelo Cardone.  All were tenured teachers above the age of

forty (40).  They were informed that they were being involuntarily transferred at the

Superintendent's directive. (Ex. 3 at 17-20).

20.     Pipkin, Walker and Cardone were not the only parties subject to an

involuntary transfer.  Of those involuntary transfers, excluding those transferred due to

elimination of a program, all were over the age of forty (40) (Ex. 21).  Pipkin, Walker and

Cardone were not offered Numeracy Coach positions (Ex. 3 at 55).

21.     Concurrently, the BOE eliminated the MRT position formerly held by

Pipkin.  The position is now known as a Numeracy Coach.  (Ex. 3 at 50-51); (Ex. 4 at 46-

47).

8

22.    The focus of the Numeracy Coach position is professional development for classroom teachers in a designated core subject, i.e., reading, math, writing. (Ex. 4 at 47-48).

23.    Whereas, the MRT position worked with small groups of students in targeting weaknesses. The Numeracy Coach works directly with teachers in creating lesson plans, delivering instruction and completing observations regarding classroom instruction. (Ex. 4 at 46-47); (Ex. 3 at 23-24).

24.    At the time of Pipkin's transfer, the MRT position at Blackham was not being eliminated nor adversely impacted by a funding decrease. (Ex. 3 at 24).

25.    When implementing an involuntary transfer, the CBA gives respect and preference to the seniority of the teacher subject to the involuntary transfer in juxtosposition of the interests of the district. (Ex. 3 at 25); (Ex. 13).

26.    Rosa, a BOE administrator with extensive classroom experience, acknowledged that a return to the classroom from the MRT position requires an adjustment on behalf of the teacher. (Ex. 4 at 6, 46).

27.    Pannozzo, another BOE administrator with extensive classroom teacher experience, acknowledges that transfer of a teacher to the classroom or another school may not serve the best interests of the teacher and/or the new placement. (Ex. 3 at 6-7; 38-39).

28.    In light of Perachio's concerns over the number of workshops conducted by Pipkin, he approved a workshop that scheduled in direct conflict with a literacy workshop. (Ex. 1 at 83-86).

9

PLAINTIFF, SCARLETT PIPKIN

BY: _____

Marc L. Glenn
Law Office of
W. Martyn Philpot, Jr., L.L.C.
409 Orange Street
New Haven, CT 06511-6406
Tel. No. (230) 624-4666
Federal Bar No. 21369
Her Attorneys

## CERTIFICATION

*THIS IS TO CERTIFY* that a copy of the foregoing was mailed, postage prepaid, this date, to all counsel of record as follows: Pamela J. Coyne and Lisa M. Grasso, Durant, Nichols, Houston, Hodgson & Cortese-Costa, P. C., 1057 Broad Street, Bridgeport, CT 06604.

_____
Marc L. Glenn

s:\docs\employ\pipkin.56(a)(2)stmt.4-26-04