

*United States District Court*
*District of Connecticut*

4/13/04

*Phyllis Malone*

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCARLETT PIPKIN, | : | |
| | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **3:03CV0019 (MRK)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRIDGEPORT BOARD OF EDUCATION,** | : | |
| **SUPERINTENDENT SONIA DIAZ SALCEDO,** | : | |
| **in her official and individual capacities,** | : | |
| **ASSISTANT SUPERINTENDENT, KENNETH** | : | |
| **HENRICI, in his official and individual** | : | |
| **capacities, INTERIM MATHEMATICS** | : | |
| **DIRECTOR, RICARDO ROSA, in his official** | : | |
| **and individual capacities, GEAR UP** | : | |
| **DIRECTOR, LEROY DUPEE, in his official** | : | |
| **and individual capacities AND TEACHER,** | : | |
| **JORGE PEZO, in his official and individual** | : | |
| **capacities,** | : | |
| | : | |
| **Defendants.** | : | **MARCH 17, 2004** |

### MEMORANDUM OF LAW IN SUPPORT
### OF MOTION FOR SUMMARY JUDGMENT

Defendants Sonia Diaz Salcedo, Kenneth Henrici, Ricardo Rosa and Jorge Pezo, by and

through their undersigned counsel, submit this memorandum of law in support of their Motion

for Summary Judgment.

# I.    FACTUAL BACKGROUND

## A.    Allegations of the Complaint

The Corrected Amended Complaint ("Complaint") presents a claim, in five counts, by Scarlett Pipkin ("Plaintiff") against the Bridgeport Board of Education (the "Board"), Sonia Diaz Salcedo, Kenneth Henrici, Ricardo Rosa, Leroy Dupee and Jorge Pezo, based on alleged violations of the Fourteenth Amendment, as well as 42 U.S.C. §§ 1981 and 1983 (Compl., Count One); intentional and negligent infliction of emotional distress (Compl., Counts Two and Three); violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Compl., Count Four) and the Age Discrimination in Employment Act ("ADEA") (Compl., Count Five). All five counts are primarily based on the alleged denial of a teaching position in the Summer 2001 Gear Up Program. (See Compl., Count One, ¶¶ 10-19).

Plaintiff alleges that she has been employed as a teacher by the Board for over thirty-two (32) years. (Id., ¶ 11). She further alleges that during her employment with the Board, she served as a Mathematics Resource Teacher for over twenty-three (23) years. (Id.).

Plaintiff alleges that "Sonia Diaz Salcedo was and is the Superintendent of Schools for the City of Bridgeport." (Id., ¶ 5). Plaintiff further alleges that "Kenneth Henrici was and is the Assistant Superintendent of Schools for the City of Bridgeport." (Id., ¶ 6). She alleges that "Ricardo [sic] Rosa was and is the Interim Mathematics Director for the Board of Education of the City of Bridgeport," (Id., ¶ 7); and that "Jorge Pezo was and is a Teacher for Board of

Education of the City of Bridgeport." (Id., ¶ 9). Each of these individuals is being sued in their "official and individual capacities." (Id., ¶¶ 5-7 and 9).

Plaintiff alleges that during the 2000-2001 school year, she participated in training for the Gear Up Program and further alleges that during the 2000-2001 school year, she taught in the after-school Gear Up Program. (Id., ¶¶ 13-14). She alleges that in May 2001, she applied for a position in the Summer 2001 Gear Up Program, and that she sent her application by facsimile and U.S. mail to Defendant Ricardo Rosa. (Id., ¶ 15).

Plaintiff alleges that on June 2, 2001, a co-worker informed her that she received a letter from Dr. Rosa, confirming the co-worker's appointment to teach in the Summer 2001 Gear Up Program, which immediately prompted Plaintiff to inquire by e-mail to Dr. Rosa into the status of her application. (Id., ¶ 16). On June 7, 2001, Plaintiff received a letter of rejection from Dr. Rosa for the Program. (Id., ¶ 17). The Complaint alleges that the letter from Dr. Rosa arrived in a "used" envelope, was postmarked May 31, 2000 and was placed in Plaintiff's mailbox at her home. (Id.).

Plaintiff alleges that other teachers who were hired for the Summer 2001 Gear Up Program were "completely new to it and had substantially less experience," and "were younger and were white of color and caucasian of race." (Id., ¶ 18).

Plaintiff further alleges that on or about June 21, 2002, she received a letter from the Office of Human Resources requesting a meeting, which occurred on July 2, 2002. (Compl., Count One, ¶ 22). She alleges that during that meeting she was unfairly, and in retaliation for

3

filing the CHRO complaint, involuntarily transferred and demoted from a Math Resource Teacher at Blackham School to a classroom teacher and, further, was told to find a job from a list of teacher vacancies. (Id.).

### B.    Claims Brought by Plaintiff

In Count One, Plaintiff asserts claims under the Fourteenth Amendments and 42 U.S.C. §§ 1981 and 1983 claiming that Defendants deprived her of liberty without due process and denied her equal protection. (Id., ¶ 26).

In Count Two, Plaintiff alleges that Defendants' acts constituted intentional infliction of emotional distress (Compl., Count Two, ¶ 26); and in Count Three, she alleges that Defendants' acts constituted negligent infliction of emotional distress. (Compl., Count Three, ¶¶ 27, 28).

In Count Four, Plaintiff alleges that Defendants' acts "were in the nature of discriminatory and harassive conduct in substantial part due to her race and color," in violation of Title VII. (Id., ¶ 21). Plaintiff further alleges that Defendants' "ongoing harassment of the plaintiff, as well as the disparate treatment afforded her in relation to other teachers, amounted to a discriminatory employment practice being perpetrated against the plaintiff which constituted a hostile work environment," in violation of Title VII. (Id., ¶ 22).

In Count Five, Plaintiff alleges that she is over fifty (50) years old, (Compl., Count Five, ¶ 21), and that Defendants "improperly considered" her age "in determining that she no longer was a qualified teacher . . . ." (Id., ¶ 22). She alleges that Defendants violated the ADEA. (Id., ¶ 23).

4

**C.    Plaintiff's Employment in the Gear Up Program**

Gear Up is a school reform initiative which provides low income students with skills to enable them to get a post-secondary education. (Birks Aff., ¶ 4).[1] The initiative includes the following: partnering with local school districts to initiate a systemic curriculum reform effort; implementation of a comprehensive professional development plan; development and delivery of parent programs; design and delivery of after-school programs focused on positive development; and coordination of mentoring and tutoring programs for academic support. (Id., ¶ 4).

The Gear Up Program is designed to provide students with the necessary skills to be competitive in an Algebra program. (Dupee Dep., p. 6). At all time relevant, there was a concerted effort by Defendant Board to move Algebra I down to an Eighth Grade level. (Id., p. 7). The Gear Up Program was initiated to achieve that objective. (Id., p. 8).

The project, which covered certain schools in the cities of Bridgeport, New Haven and Hartford, involved six schools in Bridgeport. (Birks Aff., ¶ 5). Carol Birks, an employee of the State of Connecticut, Department of Higher Education, State Gear Up Project, held the position of Site Coordinator at all times relevant to the instant case. (Birks Aff., ¶ 3).

Defendant also received a grant to initiate a Gear Up Program and, as a result, administered it in another seven schools. (Birks Aff., ¶ 6). Kathleen Gombos coordinated

---

[1] The Affidavits of Carol Birks, Jorge Pezo and John Perachio are attached hereto. The Affidavits are referenced as "Birks Aff., ¶___".

Defendant's Gear Up Program that was the partnership between Defendant and the State. (See Gombos Aff., ¶ 2).

At all times relevant to Plaintiff's claims in connection with the Summer 2001 Gear Up program, she was in a non-classroom assignment as a Mathematics Resource Teacher in the Mathematics Department and assigned to Blackham School. (Plaintiff Dep. pp.31, 98). Plaintiff was supervised by Leroy Dupee, who served as Director of Mathematics, until his retirement in June of 2000. (Dupee Dep., p. 5).

The first summer session for the Gear Up Program took place in the Summer of 2000. (Dupee Dep., p. 8; Plaintiff Dep. p. 97). Leroy Dupee served as a Director of the Gear Up Program and coordinated it for that Summer. (Dupee Dep., pp. 6-7). At the time, Mr. Dupee was employed as a consultant with both the Board and State of Connecticut, Department of Higher Education. (Dupee Dep., pp. 5-6).

There was a posting to solicit candidates for the program. (Dupee Dep., p. 8). According to Mr. Dupee:

> [We] were looking for someone that had the necessary skills to effectively deliver a quality program to students based on a curriculum that was provided by the Bridgeport Board of Education, and someone who had the necessary skills to deliver that program.

(Id., p. 9).

The Gear Up Program received less applications than the number of slots that needed to be filled. (Dupee Dep., p. 9). Plaintiff applied for the Summer 2000 Program and was hired.

(Id., p. 10).  Due to the insufficient number of candidates for the Summer 2000 Program, all

teachers who applied were accepted. (Id., pp. 10, 26-27).  The District also solicited candidates

from outside of the District and reposted the position with the District. (Id., p. 32).

**1.     Plaintiff's Performance as a Teacher in the Summer 2000 Gear Up Program was Unsatisfactory**

Teachers in the Summer 2000 Gear Up Program were expected to adhere to a certain

curriculum, which was considered to be the minimal curriculum taught to students.  (Dupee

Dep., pp. 10-11; Exh. 2).  In that regard, Mr. Dupee observed the classrooms in the Summer of

2000.  (Id.).  He was physically in the classrooms at least three to four times during the duration

of the Summer.  (Id.).

When Mr. Dupee observed Plaintiff's classroom, he found that she made a concerted

effort to follow the curriculum; however, he had some concerns.  (Id.).  His primary concerns

were the quality of the delivery of instruction and certain skills, particularly in the area of

teaching the effective use of the graphing calculator, which was an integral component of the

curriculum.  (Id., pp. 11-12).  Mr. Dupee brought his concerns to Plaintiff's attention and made

the recommendation that she seek some support and assistance.  (Id., p. 12).  Plaintiff worked in

a cluster with some other teachers, and there was one teacher who was quite apt at using the

graphing calculator.  (Id.).  Mr. Dupee found that Plaintiff "carried kids into his class for him to

teach them." (Id., p. 12).

7

Upon cross-examination by Plaintiff's counsel in deposition, Mr. Dupee reiterated that he had not been satisfied with her performance in the Summer 2000 Program. He was not satisfied to the point that she possessed the necessary skills to teach the proper use of the graphing calculator. (Dupee Dep., p.33). He told Plaintiff that the quality of the delivery of instruction to students had to be improved. (Id., p. 35).

In addition to Mr. Dupee's concerns with respect to the quality of Plaintiff's instruction, Mr. Dupee was dissatisfied with her refusal to carry out her responsibilities. (Dupee Dep., p. 12). During the Summer of 2000, Mr. Dupee specifically asked Plaintiff to call the parents of students who did not show up for classes. (Id.). She was given the directive to do so and encourage their continued participation in the Program. (Id., p. 34). Plaintiff responded that she would not call the parents, that it was just not her job to do so. (Id.).

Defendant Jorge Pezo had the day-to-day monitoring responsibility for the Summer 2000 Gear Up Program. (Dupee Dep., p. 52). Leroy Dupee directed Jorge Pezo to also approach Plaintiff about contacting students, and he reported back that Plaintiff had given him the same response. (Id., p. 34).

Plaintiff acknowledges that she failed or refused to abide by Mr. Dupee's directive that she contact parents of students who did not show up for her classes in the Summer 2000 Gear Up Program. (Plaintiff Dep., p.104). However, Plaintiff admits that while she may have raised points to Mr. Dupee, regarding student vacations and that a guidance counselor could make calls,

8

in their meeting, "[h]e never said "Never mind; don't make the calls." (Id., pp. 103, 105). Plaintiff made calls after the meeting, but she subsequently stopped. (Id.).

At the conclusion of the Summer 2000 program, Defendant Kenneth Henrici sent letters to everyone who participated in the program. (Dupee Dep., p. 13; Exh. 3). Mr. Dupee heard by word of mouth that a letter did go out from Mr. Henrici's office, but it was not at his recommendation. (Id.). Mr. Dupee personally sent a letter of commendation to certain staff in the Gear Up Program of Summer 2000, in which he acknowledged appreciation for them administering the program at the level of expectation. (Dupee Dep., pp 13-14; Exh. 4). The letter was not sent to everyone in the program. (Id., p. 14). Rather, the letter was sent only to those individuals, who, in Mr. Dupee's "professional opinion, administered the program the way it was designed to be administered. (Id.). There were a few individuals in the program that just did not measure up." (Id.). Notably, Mr. Dupee did not send the letter to Plaintiff. (Id.).

### 2. Plaintiff Was Not Selected for the Summer 2001 Gear Up Program Based Upon Her Performance in the Summer of 2000

The Gear Up Program was held again the Summer of 2001. (See Complaint ¶ 15; Dupee Dep., p. 15). There was a sizable increase in pay from the previous year. (Dupee Dep., p. 15; Exh. 5). As in the prior summer, there was an application to solicit candidates for the Program. (Id.). Plaintiff was one of many applicants. In fact, the number of applicants was more than double the number of positions for the Summer 2001 program. (Id., pp. 15, 55).

A Teacher Selection Committee ("Committee") was formed in 2001. (Dupee Dep., p. 16; Pezo Aff., ¶ 5; Birks Aff., ¶ 7; Gombos Aff., ¶ 4). The members of the Committee were:

- Leroy R. Dupee, Program Director, retained by the State of Connecticut, Department of Higher Education, 58 years old (at that time), Black, African-American Male;
- Carol Birks, Gear Up Site Coordinator, employed by the State of Connecticut, Department of Higher Education, 33 years old (at that time), Black, African-American, Female;
- Kathy Gombos, Gear Up Site Coordinator, employed by the Bridgeport Board of Education, 33 years old (at that time), White, Female; and
- Jorge Pezo, Mathematics Curriculum Specialist, employed by the Bridgeport Board of Education, 39 years old (at that time), Hispanic, Male.

(Id.).

The Committee met to review applications, screen applicants and review recommendations, which were submitted to the Mathematics Department of Defendant Board. (Dupee Dep., p. 18; Pezo Aff., ¶ 5; Birks Aff., ¶ 7; Gombos Aff., ¶ 4). Each applicant's application was assessed individually by the Committee with respect to his or her knowledge, experience and ability to teach Algebra and Geometry. (Id.). The Committee was looking for candidates who could administer the Program effectively and possessed the necessary skills to do so. (Dupee Dep., p. 18; Pezo Aff., ¶ 5; Birks Aff., ¶ 7; Gombos Aff., ¶ 4).

With respect to Plaintiff's application, Mr. Dupee provided his input to the Committee regarding her performance in the Gear Up Program during the Summer 2000 Program. (Dupee

Dep., p. 18). He recommended that the Committee vote "no" on whether to employ her for the Summer 2001 Program. (Dupee Dep., pp 18-19; Pezo Aff., ¶¶ 10, 11; Birks Aff., ¶¶ 12, 13; Gombos Aff., ¶¶ 9, 10). In that regard, Mr. Dupee advised the Committee that Plaintiff did not follow curriculum and that he discussed her failure to do so at that time. (Pezo Aff., ¶ 10; Birks Aff., ¶ 12; Gombos Aff., ¶ 9). He further advised the Committee that Plaintiff failed to contact parents of students who did not show for classes, and when criticized for her failure to do so, Plaintiff stated it was not her job. (Id.). It was a round table voting process, with each member having a vote. (Dupee Dep., p. 18; Pezo Aff., ¶ 5; Birks Aff., ¶ 7; Gombos Aff., ¶ 4). No other Committee members commented or made a suggestion regarding Mr. Dupee's vote. (Dupee Dep., p. 19).

Based upon Mr. Dupee's input, the Committee did not recommend Plaintiff for a position in the Summer 2001 Gear Up Program. (Pezo Aff., ¶¶ 8, 9, 11; Birks Aff., ¶¶ 10, 11, 13; Gombos Aff., ¶¶ 7, 8, 10). The decision of the Committee was unanimous. (Dupee Dep., p. 19; Pezo Aff., ¶ 8; Birks Aff., ¶ 10; Gombos Aff., ¶ 7).

At or around the time of Plaintiff's application for the Summer 2001 Gear Up Program, Defendant Ricardo Rosa held the position of Assistant Director of Mathematics. (Rosa Dep., pp 5-7). While Assistant Director, he generally had the responsibilities of both the Assistant and Director positions since there was no Director of Mathematics following Mr. Dupee's retirement. (Id.). At the time, his responsibilities included observing and evaluating teachers at the high

11

school level as well as Mathematics Resource Teachers.  (Id.).[2]  He was also in charge of curriculum, professional development and recommending teachers for positions. (Id.).

It was Dr. Rosa's understanding that during that first Summer, the Program was struggling to find teachers to work; therefore, they approached people because there were not enough applications to fill all positions. (Id., pp. 12-13). It was also Dr. Rosa's understanding that after the first year, Mr. Dupee sought people who would teach the Gear Up curriculum the way it was intended, since the program was different from the traditional program in that it requires individuals who allow students to become independent learners. (Id., pp. 16-17).

To Dr. Rosa's knowledge, the Committee was headed by Mr. Dupee, who ran the entire process. (See Rosa Dep., pp. 12-13, 22-24). After the Committee determined the teachers to be selected for the Summer 2001 program. Mr. Dupee informed him of the selections and the two had conversations as to who had been selected. (Rosa Dep., pp. 48-51).  Mr. Dupee told Dr. Rosa of comments about Plaintiff and other teachers and said that some were not following the curriculum. (Id.).  Mr. Dupee also told Rosa that teachers were asked to call parents in 2000

---

[2] For example, Dr. Rosa testified in deposition that he was familiar with Plaintiff since at the start of his employment with Defendant she was a Mathematics Resource Teacher at Blackham School. (Rosa Dep., pp 18-19). Dr. Rosa had to evaluate Plaintiff for the 2000-2001 school year. (Id.). During that year, the Principal made comments about her performance. (Id.). Based upon those comments, Dr. Rosa recommended to the Principal that he (Rosa) observe Plaintiff in the classroom. (Id.). Dr. Rosa subsequently observed Plaintiff and determined that she was not performing to her experience level. (Id.). Following the observation, Dr. Rosa had a conversation with Plaintiff about his observations and pointed out several areas that she could work on. (Id., 20-21).

because attendance was low and that Plaintiff said "it wasn't her job." (Id.).

At Mr. Dupee's suggestion, Dr. Rosa agreed to have his name on the letters sent to successful teachers as well as those who were not accepted. (Rosa Dep., pp. 22-24; see Dupee Dep., Exhs. 6, 7). The letters were ultimately sent over Dr. Rosa's and Mr. Dupee's signatures with initials. (Id.; Dupee Dep., pp. 19-20, Exhs. 6, 7).

Plaintiff states that she received notification that she was not selected for the Summer 2001 Program via that letter, which she received in the mail on June 7, 2001. (Plaintiff Dep., p. 123). Plaintiff claims that the envelope was "recycled" as it appeared to have a label over other print on it. (Id., p. 123). Plaintiff claims that although the postmark on the envelope was May 31, she did not receive it until June 7, 2001, and, further, contends that the envelope must have been placed in her mailbox rather than mailed. (Id.). Plaintiff never contacted the United States Post Office to inquire into the reason that she would receive mail one week after the date it was postmarked. (Id.). She simply assumes the letter was placed in her mailbox because she "should" have received it sooner. (Id., pp. 121, 123). In fact, she admits that she does not know whether it was delivered by the postman or whether someone put it in her mailbox. (Id., p. 122).

Plaintiff subsequently filed a grievance to challenge the denial of the Summer 2001 position. (Plaintiff Dep., pp. 111-113). The grievance was presented to Defendant Kenneth Henrici, the Assistant Superintendent who oversaw the Gear Up Program that year. (Plaintiff Dep., p. 120). It is Plaintiff's understanding that the grievance was delayed or the parties changed the date. (Id.). She contends that the grievance was not rescheduled. (Id.).

13

### 3.    Successful Candidates for the Summer 2001 Program

The record reflects that a diverse group of individuals taught in the Summer 2001 Gear Up Program. (Rosa Dep., Exh. 8). Of the applicants hired, there were three Black females, six White females, two White males and one Asian male. (See Exh. 8).[3] The three Black female teachers are each over 50 years of age. They are:  Carolyn Coleman (55), Ruth Garth (52) and Freddie McReynolds (69). (Id.).

Although Dr. Rosa had no role in determining the teachers selected for the Summer 2001 Gear Up Program, he assumed the role for teacher selection for the 2002-03 school year, including the Summer. (Rosa Dep., pp. 12-13).  Thus, he is familiar with the skill level of certain teachers who had been selected for the Summer 2001 Program and were subsequently selected for the Summer of 2002. (Id.).  Upon questioning by Plaintiff's counsel in deposition, Dr. Rosa discussed two teachers who are below the age of 40.  He stated that one, Michael Sevigny, relates well with students and is tune with new math, and his thinking goes along with what the District is trying to develop.  (Rosa Dep., pp 31-35).  Another, Lori Motta, was recommended by her Principal. (Id.).  Dr. Rosa was clear that the level of certification is just a function of length of time. (Id., pp. 36-40).  He emphasized that the selection process for Gear Up was not based on seniority. (Id.).  In fact, experience level is not as important as being able to teach. (Id.).

---

[3] No information was available on one individual, John Campbell.

14

Dr. Rosa also discussed other successful applicants and pointed to the fact that their philosophy of mathematics matched with the program. (Rosa Dep., pp. 51-52). He also noted that experience was important. (Id.). In doing so, Dr. Rosa referred to Freddie McReynolds and Ruth Garth, two African American, Black female teachers who are over the age of 40, as two individuals who were selected for those reasons. (Id.). He cited to these individuals' attributes, stating that McReynolds and Garth are excellent with kids and that Carolyn Coleman had many years of experience and worked well with teachers. (Id.).

**D.      Plaintiff's Performance as a Mathematics Resource Teacher was Deficient**

Plaintiff was assigned to Blackham School as a Mathematics Resource Teacher during the 2001-2002 school year. (Plaintiff Dep., p. 31). John Perachio was appointed as Principal in January 2002. (Perachio Aff., ¶ 3).

During his tenure in the 2001-2002 school year, John Perachio met with Plaintiff to discuss his performance expectations. (Perachio Aff., ¶ 6). In or around early February 2002, he met with Plaintiff to convey his expectation that as a Mathematics Resource Teacher she should hold five workshops. (Plaintiff Dep., p. 50).

Mr. Perachio made clear that Plaintiff must submit lesson plans, which are required by District policy. (Id., p. 68). He also requested that she submit a Mathematics budget for Blackham School for his review and approval, and subsequently directed her to reduce it because funding was cut. (Id., p. 49).

15

Plaintiff admits that she failed to conduct the required number of workshops. When questioned on this point, she claimed that teachers were overloaded with workshops. (Plaintiff Dep., pp. 58-59). Plaintiff ultimately admitted that she did not conduct the five workshops because she lacked planning time and it is a lot of work to prepare the materials and presentations for them. (Id., pp. 57, 58-59, 74).

Plaintiff acknowledges that the School District receives significant funding from the Institute of Learning, which focuses on professional development, but that she did not avail herself of the materials because she did not have the training to conduct those workshops. (Id., p. 59). However, Plaintiff did not express to John Perachio that she did not have the skills or training to present Institute of Learning workshops. (Id., p. 60).

Plaintiff states that she did conduct one workshop, which she asserts had low attendance because John Perachio scheduled a different workshop for certain teachers on the same day. (Plaintiff Dep., p. 72). Since those teachers would have attended Plaintiff's workshop, she only had four attendees. (Id.). Despite the low attendance, John Perachio in no way criticized Plaintiff for the result. (Id., p. 73). To the contrary, Plaintiff acknowledges that he sent her a letter to apologize for the scheduling conflict. (Id.).

With respect to the Mathematics budget, Plaintiff admits that despite John Perachio's instruction, she submitted a budget without significant decreases. (Plaintiff Dep., p. 48). After Plaintiff made only minimal cuts to the budget, Perachio advised her that they were insufficient

16

and requested that she make further reductions. (Id.). However, Plaintiff refused to reduce the budget any further. (Id.).

John Perachio also advised Plaintiff of his concern with her relationship with colleagues and sent letters to her regarding them. (Perachio Aff., ¶7; Plaintiff Dep., pp. 60-61). On one occasion, after Plaintiff gave a workshop with Reading Specialists, Mr. Perachio wrote a letter to her stating that a number of teachers said she was rude and intimidating and that she should keep in mind that they must work together. (Plaintiff Dep., pp. 60-61).

There is no dispute that John Perachio was dissatisfied with Plaintiff's performance. In fact, Plaintiff acknowledged this repeatedly in her deposition. Mr. Perachio wrote to her to raise issues with her relationship with colleagues, failure to hold workshops and requirement that she hand in lesson plans. (Plaintiff Dep., pp. 60-63).

In her summative Performance Appraisal for the 2001-02 school year, John Perachio identified Plaintiff's performance deficiencies. (Plaintiff Dep., pp. 64-67; Exh. 4, attached 2001-02 Performance Appraisal). Plaintiff states that she was upset by the appraisal and, when she received it, ran to her office space and became hysterical. (Plaintiff Dep., pp. 65-66). Toni Cates, the Assistant Principal of Blackham School with responsibility for direct oversight of Plaintiff's daily performance, learned that Plaintiff was upset and went to see her in her office. (Id.). Plaintiff left Blackham School that day, never to return, and refused to submit documentation in support of her absence for the rest of the year. (Plaintiff Dep., p. 66; see Perachio Aff., ¶ 5e).

Plaintiff maintained her refusal to provide the required documentation despite further requests made by John Perachio, including in the subsequent school year. (Plaintiff Dep., p. 136; see Perachio Aff., ¶ 7e). In her deposition, Plaintiff claimed that she had "never heard" of submitting documentation to the building administrator and that such information should be provided to Human Resources. (Plaintiff Dep., p. 136). However, the record is void of any evidence that she ever provided documentation to Human Resources or any supervisor. In fact, Plaintiff makes no claim that she did so.

Plaintiff filed a grievance to challenge her 2001-02 Performance Appraisal. (Plaintiff Dep., p. 91). The Union represented her in the process. (Id., p. 92). Assistant Superintendent Henry Kelly, who is African American, heard Plaintiff's grievance. (Id.). Mr. Kelly denied the grievance and upheld the Performance Appraisal with the sole exception that recommendation No. 5 be stricken. (Id.). Thus, while Mr. Kelly agreed that Plaintiff should not be required to substitute for absent math teachers, no other aspect of the Appraisal was changed. (Id.).

**F.    Plaintiff was Transferred to a Classroom Assignment in 2002-2003**

**1.    Mathematics Resource Teacher v. Classroom Teacher**

Plaintiff was assigned as a Mathematics Resource Teacher at Blackham School until her assignment to a classroom for the 2002-03 school year. The record of evidence is undisputed that there is no difference in salary, fringe benefits or other benefits between the two assignments. (Plaintiff Dep., p. 35; Pannozzo Dep., p. 44; Exh. 5).

18

Teachers holding a non-classroom assignment, are entitled to the same contractual rights, salary and benefits as those who are assigned to a classroom. (Plaintiff Dep., p. 35; Pannozzo Dep., p. 44; Exh. 5). The only position that receives additional compensation is the School Psychologist, a position in the bargaining unit, since those employees work additional days. (Pannozzo Dep., p. 44; Exh. 5). Plaintiff admits that the assignments are equal financially but contends that : "A step away from being in the classroom with 20 other students is a step up." (Plaintiff Dep., p. 156).

The difference in the nature of the Mathematics Resource Teacher as compared to the classroom teacher is that the Mathematics Resource Teacher worked with small groups of students as directed by the building principal and would provide professional development support or model lessons with math teachers in the buildings they were assigned to. (Pannozzo Dep., p. 23). In contrast, a classroom teacher, while still an instructor, would work with larger groups of students because the whole class would be assigned to the classroom teacher. (Id., pp. 23-24). The classroom teacher could still work with small groups of students within the large class structure and would still attend professional development as a teacher within the Board. (Id.). The classroom assignment is absolutely not a demotion in relation to a non-classroom assignment. (Id., p. 45).

<b>2.    The Math Resource Teacher was Redesigned to Numeracy Coach</b>

During the course of the 2001-2002 school year, the District decided to eliminate the Mathematics Resource Teacher assignment and create the assignment of Numeracy Coach.

19

(Pannozzo Dep., p. 50). Similarly, the District decided to eliminate the Reading Specialist assignment and create a Literacy Coach. (Id., pp. 55-56). In contrast to the Mathematics Resource Teacher, which focused on pulling students out of classrooms in order to work with small groups and some degree of modeling of lessons for teachers, the focus of the Numeracy Coach is to be a coach for teachers, with emphasis on professional development and bringing that back to the school, and modeling lessons with teachers so that more effective instruction would be produced. (Pannozzo Dep., pp. 19, 51). The focus is more on "best practices" as denied in education, with a "train-the-trainer" model. (Id.). The Literacy Coach was created with the same change in focus. (Id., pp. 55-56).

In June 2002, Defendant Salcedo transferred several teachers from the non-classroom assignments of Reading Specialist or Mathematics Resource Teacher to classroom assignments. Plaintiff was one of four Mathematics Resource Teachers who were transferred. (Pannozzo Dep., p. 55). The other teachers, Angelo Cordone, Ann Brennan and Mary Walker, are White. (Pannozzo Dep., p. 55; Exh. 9). With respect to the group of Reading Specialists, four are White, and one is Hispanic. (Pannozzo Dep., p. 55; Exh. 9).

The teachers who were transferred initially met with Defendant's Executive Director of Human Resources, Carole Pannozzo,[4] to be notified of their transfer and to discuss their preferences regarding grade level, subject and school assignment. (Plaintiff Dep., p. 79;

---

[4] At the time of the meeting, Carole Pannozzo was the Interim Executive Director of Human Resources.

Pannozzo Dep., p. 26; Exh. 7). Plaintiff and Mary Walker met with Carole Pannozzo on July 2, 2002. (Pannozzo Dep., p. 27). In that meeting, Ms. Pannozzo advised them that pursuant to a directive of the Superintendent, they would be assigned to a classroom for the 2002-2003 school year. (Id., p. 22). Ms. Pannozzo showed Plaintiff and Mary Walker the current list of vacancies throughout the District and gave them a copy so that they could review the opportunities, of which there were several, to transfer to an assignment of their choice. (Id., p. 23). She requested that they evaluate the positions that the Board had available and call if there was a position of interest. (Id.). As indicated on the document, the list is updated during the Summer based upon teacher transfers and resulting vacancies and subsequent listings are sent to schools via e-mail and posted. (Id., pp. 46-48).

During that meeting, Ms. Pannozzo also told Mary Walker that she had recently spoken with Dr. Rosa, who indicated that she might want to go to Read School. (Pannozzo Dep., p. 46). Dr. Rosa was aware that Ms. Walker was going to be one of the teachers who were reassigned and discussed with Ms. Pannozzo that she had previously worked at Read School. (Id.). Dr. Rosa recommended that Mary Walker may want to consider it again because she knew the staff there. (Id.).

Plaintiff subsequently stopped into Human Resources and told Carole Pannozzo that she was going to apply for a position at Central High School. (Pannozzo Dep, p. 27). However, in subsequent conversations, Plaintiff informed Ms. Pannozzo that she would be taking a position at Barnum School. During the discussion, Plaintiff did not indicate dissatisfaction with that

position or that she wanted a different position. (Id., pp. 55-56). At one point Plaintiff had mentioned to Carole Pannozzo that she wanted a position at Central High School. (Plaintiff Dep., p. 90). She then told Ms. Pannozzo that she was interested in a position at Wilbur Cross School. (Id.). There was also an opening for a Math teacher at Roosevelt School. ( Id.). However, Plaintiff decided against the Math teacher positions and accepted a Sixth Grade classroom teacher position at Barnum School. (Id.). She states that the Principal was happy to take her. (Id.). Plaintiff did not ask Carole Pannozzo for assistance in the process of deciding on a position. (Id., p. 91).

Plaintiff admits that she could have chosen a Math teacher position at Central High School, Harding High School or Roosevelt School. (Plaintiff Dep., p. 143-144). She did not seek an interview at either school. (Id.). Plaintiff also admits that had she chosen a Math teaching position, she would not need to teach other subjects such as Social Studies and Reading, which are part of the responsibility of the self-contained Sixth Grade classroom at Barnum School. (Id., p. 146). After teaching at Barnum School for the 2002-03 school year, Plaintiff did not request a transfer to any other school, nor did she explore in any way whether there was a vacancy in Math in a different grade level. (Id.). As such, Plaintiff is currently teaching sixth grade at Barnum School. (Id.).

E.    **Plaintiff Declined Two Numeracy Coach Positions**

Plaintiff was one of several teachers who filed a grievance regarding the involuntary transfer. (Plaintiff Dep., p. 95). The grievances were ultimately settled during the grievance

arbitration process, more fully described in the Collective Bargaining Agreement, and the grievant teachers were offered reassignment to Numeracy Coach positions. (See Plaintiff Dep., p. 95). In fact, Plaintiff was offered a Numeracy Coach assignment at Maplewood School and Edison School. (Plaintiff Dep., p. 95). Plaintiff states that she declined both Numeracy Coach positions because she felt entitled to select the school in which she would be assigned as a Numeracy Coach. (Id.). Plaintiff states that she did not want to go to those schools since she would have to get to know the staff and principals and she would be starting new. (Id.). Plaintiff states that it would be her desire to return to Blackham School and, further, would do so with full knowledge that John Perachio is still the Principal of Blackham School. (Id.).

## II.    STANDARDS FOR GRANTING A MOTION FOR SUMMARY JUDGMENT

In order to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ. in City of New York,* 131 F.3d 305, 312 (2d Cir. 1997). A nonmoving party's offer of a scintilla of evidence in support of her position is insufficient to prevent summary judgment. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 249-52, 106 S.Ct. 2505 (1986) (nonmoving party must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

Further, in order to defeat summary judgment, "'the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the

defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Economou v. Caldera*, No. 99 Civ. 12117 AJP, 2000 WL 1844773 *36, (Dec. 18, 2000) (Peck, Mag. J.) (copy attached) (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). *Stronkowski v. St. Vincent's Medical Ctr.*, Civ. No. 3:94 CV2175 AHN, 1996 WL 684407 *8, (D. Conn. Aug. 1, 1996) ) Nevas, J. (copy attached). "In the context of a case alleging employment discrimination, conclusory allegations of discrimination are insufficient to defeat summary judgment." *Spillane v. Henderson*, 129 F. Supp.2d 223 (E.D.N.Y. 2001) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied*, 474 U.S. 829, 106 S. Ct. 91 (1985)). Where "an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Id.*; *see Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (summary judgment affirmed where plaintiff put forward only conclusory allegations to suggest a causal relationship between her complainants and either her negative evaluation or her termination).

As set forth below, the record in this case is devoid of any evidence to support the allegations of the Corrected Amended Complaint. The evidence adduced through discovery shows that (i) Plaintiff fails to state a claim upon which relief can be granted pursuant to the Fourteenth Amendment as the record is void of any evidence to establish a deprivation of liberty; (ii) Plaintiff fails to state a claim for intentional infliction of emotional distress since the alleged

actions of Defendants were without egregious or outrageous conduct; (iii) Plaintiff fails to state a claim for negligent infliction of emotional distress, since Defendants' actions did not occur in the course of termination of her employment and the evidence fails to establish foreseeability and likelihood of causing harm; (iv) Plaintiff fails to state a claim upon which relief can be granted under Title VII, 42 U.S.C. § 1981 and/or the ADEA since she fails to establish any circumstances which give rise to an inference of discrimination as required to establish a *prima facie* case of discrimination; and (v) Plaintiff fails to state a claim upon which relief can be granted under Title VII for hostile work environment since Plaintiff fails to establish that the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of her employment.

Accordingly, Defendants request that the Court grant judgment as a matter of law on each Count of Plaintiff's Corrected Amended Complaint.

## III.   ARGUMENT

### A.   Plaintiff Fails to State a Claim Upon Which Relief Can be Granted For Violation of Her Fourteenth Amendment Rights

"A Constitutional due process claim requires a deprivation of life, liberty or property." *McCall v. City of Danbury*, 116 F.Supp.2d 316, 320 (D. Conn. 2000), *aff'd by*, 16 Fed. Appx. 77 (2d. Cir. 2001) (citing U.S. Const. Amend. XIV, § 1). "Liberty may be deprived in the hiring context by the imposition of a 'stigma or disability that foreclose[s] [one's] freedom to take

advantage of other employment opportunities." *McCall*, 116 F.Supp.2d at 320 (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701 (1972)).

Plaintiff's specific allegation is that she suffered a deprivation of liberty. Her evidence in this regard hearkens back to the denial of the 2001 Summer teaching position with Gear Up. However, she offers no evidence that Defendants' actions interfered with, or prevented her from, obtaining other employment. Moreover, the record is clear that Plaintiff was in no way the subject of "stigmatizing public comments about [her] dishonest, illegal or immoral behavior." *Donato v. Plainview-Old Bethpage Cent. School Dist.*, 96 F.3d 623, 629 (2d Cir.1996), *cert denied*, 519 U.S. 1150, 117 S.Ct. 1083 (1997).

While the evidence is undisputed that Plaintiff was not rehired for the Summer 2001 Gear Up Program, Plaintiff offers only conclusory claims that she was deprived of the "freedom to take advantage" of other employment opportunities. *Id.* In fact, Plaintiff admits that she did not even apply for other positions in the Summer of 2001 or in subsequent Summers; nor did she did seek employment in another after-school program.

Further, the evidence supports a finding to the contrary based on Plaintiff's own testimony that when she sought a classroom teacher position in connection with her transfer, she had several choices. Plaintiff states that she could have selected a Math teacher position at Central High School, and the Principal at Barnum School was happy to have her come on board to teach Sixth Grade notwithstanding that she had not taught in a self-contained classroom in

26