many years.  Clearly, Plaintiff's reputation was in no way adversely affected, and her ability to procure a teaching position remained strong.

Likewise, although Plaintiff makes no allegation regarding a property interest, the record is void of any evidence to support a finding of property interest in the Summer position.  "[A] unilateral expectation of employment is not a property interest under the Constitution."  *Id.*; *Huff v. West Haven Bd. of Educ.*, 10 F.Supp.2d 117, 122 (D. Conn. 1998) (stating that a plaintiff must establish that "she has a constitutionally-protected legitimate claim of entitlement to the positions which she sought, rather than an unprotected unilateral expectation of employment to have a protected property interest") (internal quotations omitted).[5]  Thus, Plaintiff's expectation to be hired to teach in the Summer 2001 Gear Up Program is not a property interest protected by the Constitution.

Plaintiff fails to establish deprivation of either liberty or property, and thus her claim in this regard fails.  Accordingly, judgment as a matter of law in favor of Defendants is warranted on Count One.

**B.      Plaintiff Fails to Establish a Prima Facie Case of Discrimination Under Title VII, 42 U.S.C. § 1981 and/or the ADEA**

The Supreme Court established the shifting burdens of proof and production in

---

[5]  The plaintiff's claims in *Huff* were similar to Plaintiff's claims herein, i.e., she alleged that she was qualified for the positions for which she applied and that the defendants refused to hire her based on her race.  The *Huff* court held that the plaintiff had not sufficiently pled a constitutionally protected liberty or property interest in a position with the school, and dismissed her due process claim.  *Id.* at 122.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 (1981); and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742 (1993). These cases were decided under Title II, and the same scheme of proof and persuasion is applied to cases under 42 U.S.C § 1981, *see Keene*, 208 F.Supp.2d at 247 (stating that a claim brought pursuant to 42 U.S.C. § 1981 is resolved under the same framework, or burden-shifting analysis, as claims brought pursuant to Title VII); *Kellman v. Yale-New Haven Hosp.*, 99 F.Supp.2d 222, 226 (D. Conn. 2000) (same); *Zephyr v. Ortho McNeil Pharmaceutical*, 62 F.Supp.2d 599, 226 (D. Conn. 1999) (same); and the ADEA, *see Hollander v. American Cyanamid Co.*, 895 F.2d 80, 83 (2d Cir. 1990) (stating that the evidentiary framework measuring discrimination under the ADEA borrows from Title VII case law); *Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607, 609 (11th Cir. 1987) (stating that elements of a prima facie case under Title VII applies to claims of age discrimination under the ADEA).

To establish a prima facie case, Plaintiff must plead:

(1)    that she belongs to the protected class;

(2)    that her job performance was sufficient to meet the employer's legitimate expectations;

(3)    that she suffered an adverse employment action; and

(4)    that the employer's action occurred under circumstances giving rise to an inference of discrimination.

*See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

By establishing a prima facie case, the plaintiff creates an inference of discrimination. *See e.g. Byrd v. Roadway Express, Inc.*, 687 F.2d 85, *r'hrg denied*, 691 F.2d 502 (5th Cir. 1982) (stating that the purpose of a prima facie case is to identify actions taken by employer from which discrimination can be inferred). The burden of going forward then shifts to the defendant to articulate a legitimate non-discriminatory reason for its action. *See Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *Haskell v. Kaman Corp.*, 743 F.2d 113 (2d Cir. 1984).

Plaintiff fails to state a claim under Title VII, 42 U.S.C. § 1981 and/or the ADEA. Plaintiff's claims of discrimination are based on the denial of a teaching position in the Summer 2001 Gear Up Program and her involuntary transfer to a classroom assignment. Plaintiff's own testimony fails to establish any circumstances giving rise to an inference of discrimination.

With respect to Plaintiff's denial of a teaching position in the Summer 2001 Gear Up Program, the record is unequivocal that the decision was based upon her performance. There is no dispute that Leroy Dupee was dissatisfied with Plaintiff's performance as a teacher in the Summer 2000 Gear Up Program. Likewise, there is no dispute that the Teacher Selection Committee unanimously agreed not to recommend Plaintiff given the report and recommendation from Mr. Dupee.

Plaintiff offers no direct or other evidence to support an inference of discrimination. To the contrary, the record reveals that the successful individuals were selected from numerous applications, and of the successful candidates, three are Black female teachers over the age of 50. In fact, one was 69 years old at the time. Further, Defendant Ricardo Rosa, to whom Plaintiff

29

points in addressing her claim of discrimination in hiring, praised these teachers, and, notably, was the head of the Selection Committee that hired them for the subsequent Gear Up Program in the Summer of 2002.

Plaintiff's suggestion that there is an inference of discrimination because two Hispanic and one Jewish Mathematics Resource Teachers were selected lacks any support whatsoever in the record. Those few individuals were part of a larger group of applicants, which included Black teachers who were over 40 years old. Clearly there can be no inference of discrimination from the Teacher Selection Committee's decision to recommend those other Mathematics Resource Teachers. Again, while they were supervised by Defendant Rosa, there is no evidence to support an inference of discrimination with respect to his actions.

Similarly, there is no dispute that Plaintiff was one of several teachers assigned to a classroom for the 2002-03 school year after the position of Mathematics Resource Teacher and Reading Specialist assignments were redesigned to reflect changes in focus and primary responsibilities. First, in order to establish a *prima facie* case of discrimination, Plaintiff must demonstrate the she suffered an adverse employment action. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). The Second Circuit has defined an "adverse employment action" as a "materially adverse change in the conditions of employment." *Id.* To be "materially adverse, a change in working conditions must be more disruptive than a minor inconvenience or an alteration of job responsibilities." *Id.* In this regard, the Court has stated:

30

> Such a change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significant diminished material responsibilities or other indices . . . unique to a particular situation.

*Weeks v. New York State (Division of Parole)*, 273 F.3d 76, 84 (2d Cir. 2001)(internal quotation marks omitted).

In the instant case, it is undisputed that there is no difference between the non-classroom assignment of Mathematics Resource Teacher or revised assignment of Numeracy Coach, and the classroom teacher assignment. In fact, under the parties' Collective Bargaining Agreement, there is not one point of distinction between the assignments. Further, Plaintiff admits that there is no financial difference in the assignments. Plaintiff contends, instead, that there is some higher status attributed to the position. In support of her suggestion that the non-classroom assignment is more prestigious than the classroom assignment, Plaintiff asserts, without any support, that it is the belief or perception of her colleague educators that a "step away from the classroom" is a "step up." There is simply no support in the record for this conclusory allegation.

However, should the assignment to teach the classroom students be determined an adverse employment action, Plaintiff still fails to establish a claim of disparate treatment. Indeed, the record of evidence is undisputed that Plaintiff was one of four Mathematics Resource Teachers who were involuntarily transferred. The others, Angelo Cordone, Ann Brennan and Mary Walker, are White. The fact of the matter is that while Plaintiff may have disagreed with

31

the Superintendent's decision to transfer her, she points to no conduct, statement or other evidence to suggest that the decision was made based on her race, and/or age.

Thus, Plaintiff is asking this Court to accept the contention that any time an individual, who is Black, African-American, or over the age of forty, suffers an adverse employment action, it is *ipso facto* discrimination. That is simply not the law.

Accordingly, Plaintiff's failure to set forth any evidence of some connection between the denial of a Summer teaching position or transfer and discrimination warrants judgment in favor of Defendants on her Title VII, 42 U.S.C. § 1981 and/or ADEA claims in Counts One, Four and Five.

**C.    Plaintiff Fails to Establish a Claim of Hostile Work Environment in Violation of Title VII**

In Count Four, Plaintiff claims that "[t]he actions of the defendant, through its agents, servants and/or employees, namely the Superintendent, and through the ongoing harassment of the plaintiff, as well as the disparate treatment afforded her in relation to other teachers, amounted to a discriminatory employment practice being perpetrated against the plaintiff which constituted a hostile work environment as well as disparate treatment in direct violation of Title VII of the Civil Rights Act, as defendant's actions were due to, among other things, plaintiff's race and color." (Compl., Count Four, ¶ 22).  Plaintiff's evidence hearkens back to her denial of the teaching position in the Summer of 2001, her transfer and, it would appear, her tenure at Blackham School.  However, she fails to establish a claim of hostile work environment.

32

"An actionable hostile environment claim . . . must target conduct like racial taunting, stereotyping, and intimidation that does not impact an employee's pay or benefits but nevertheless is so persistent and severe that it alters 'the conditions of the victim's employment and create[s] an abusive working environment.'" *Allah v. City of New York Dept. of Parks & Recreation*, No. 01-9114, 2002 WL 31119698, at * 3 (2d Cir. Sept. 25, 2002) (Leval, Calabresi, Poole, C.J.) (copy attached), *cert. denied*, 537 U.S. 1232, 123 S.Ct. 1357 (2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23, 114 S.Ct. 367 (1993)). *See also Hanson v. Cytec Industries*, No. 399CV86 (CFD), 2002 WL 519714, at * 4 (D. Conn. Mar. 8, 2002) (Droney, J.) (copy attached) (*quoting Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)) and concluding that to state a claim of a hostile work environment pursuant to Title VII, a plaintiff must establish that her working environment is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment").

"Isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment." *Hanson, supra* (quoting *Edwards v. State of Conn. Dept. of Transp.*, 18 F.Supp.2d 168, 175 (D. Conn. 1998)). A plaintiff must also establish that "the conduct creating the atmosphere actually constituted discrimination because of race." *Hanson, supra* (quoting *Hicks v. Rubin*, No. 00-6079, 6 Fed. Appx. 70, 2001 WL 273831, at *3 (2d Cir. Mar. 20, 2001) (copy attached)). A plaintiff's embarrassment or frustration caused by

33

her employer's actions, even if racially motivated, is not enough to establish a hostile work environment. *See Hanson, supra.*

The record of evidence in the instant case is virtually identical to circumstances found by the courts as not establishing a viable claim under Title VII for hostile work environment. As Plaintiff's own testimony shows, her building Principal at Blackham School, John Perachio, stated certain performance expectations and cited her in writing for performance deficiencies during the second half of the 2001-02 school year. He praised Reading Specialists to parents in a meeting at which she was also present but not praised. He ultimately issued an unfavorable Summative Performance Evaluation, which was grieved and subsequently reviewed and upheld with the exception of an inconsequential point.

Plaintiff's own evidence establishes that she had only a few meetings with John Perachio during their time together at Blackham School, in the period of January through mid-June, 2002. Plaintiff admits that she had "very little interactions with him." (Plaintiff Dep., pp. 44-45). The two had only three or four meetings during that period. (Id.).

By Plaintiff's own account, their first interaction took place when she went to John Perachio's office seeking the Connecticut Mastery Test scores. (Plaintiff Dep., pp. 45-46). She states that it was not really a meeting. (Id.).

Plaintiff also met with John Perachio regarding the Math Department's budget for Blackham School. (Plaintiff Dep., p. 47). She went to his office and asked how much money they had budgeted for the Math Department. (Id.). John Perachio gave her the number and said

34

something to the effect that it was a "nice number." (Id., p. 48). The next meeting about the budget occurred in May 2002. (Id.). Plaintiff received a phone call from Donna Falat, an Assistant Principal, who said that John Perachio told her that they had to cut the budget. (Id.). The Assistant Principal said to Plaintiff: "Let's see what we can take out." (Id.). Plaintiff eliminated some items and presented the budget again to John Perachio, at which time he told her that the budget was still too high and she had to cut some more. (Id.).

When Plaintiff presented the revised budget to John Perachio for a second time, he told her that it needed to be cut more, and she responded that she could not cut it any more. (Plaintiff Dep., p. 49). Plaintiff could not find other things to take out, and states that they needed calculators for the building. (Id.). Although Plaintiff had refused to follow Mr. Perachio's instruction, there is no evidence to support an inference that he even acted in an inappropriate manner. In her deposition, Plaintiff testified that she did not even know if John Perachio was angry, which clearly indicates that his response, if any, truly was benign. (See Plaintiff Dep., p. 50).

Plaintiff and John Perachio also had approximately two other meetings regarding her role as a Mathematics Resource Teacher. (Plaintiff Dep., p. 50). One meeting was called by Plaintiff because there was a rumor that another person, Ann Brennan, was coming to Blackham School to work as a Mathematics Resource Teacher. (Id., p. 51). Plaintiff told John Perachio that she had been told that someone was coming to Blackham School as a Mathematics Resource Teacher and that she, Plaintiff, wanted to know how that happened. (Id.). John Perachio responded that

35

it was "none of [her] business." (Id.). Plaintiff states that she replied something to the effect either that she did not understand or that she is a taxpayer of Bridgeport and that it is her business. (Id.). Any reaction from John Perachio was certainly not memorable since Plaintiff recalls nothing that Perachio may have said in response. (Id., p. 52).

A second meeting was held regarding whether the teacher was coming to Blackham School. (Plaintiff Dep., p. 52). Plaintiff had e-mailed Defendant Rosa asking why he was sending a person there, and Rosa responded to say that he would meet with her regarding the matter. A meeting was subsequently held in John Perachio's office. (Plaintiff Dep., p. 53). Mr. Perachio explained to Plaintiff that Ann Brennan was coming to Blackham School. (Id., p. 54). Plaintiff's testimony confirms that Mr. Perachio made an effort to make Plaintiff feel positively about the addition to the staff. He stated that they would have more people and they should meet. (Id.).

During the meeting, John Perachio also discussed with Plaintiff that he wanted her to conduct a certain number of workshops. (Plaintiff Dep., p. 55). Plaintiff admits that she assumed that he was telling her to do a certain number of workshops because he was a new Principal and with the Institute of Learning, there were a lot of funds for professional development. (Id.). Plaintiff admits that Mr. Perachio was expressing that he wanted to increase the level of professional development since the funding was there to do it. (Id., p. 56). During the meeting, Plaintiff did not express any displeasure to Mr. Perachio about his request. (Id.).

36

With respect to performance expectations, John Perachio also told Plaintiff that she would have to submit lesson plans. ((Plaintiff Dep., p. 68). Plaintiff does not dispute that lesson plans are required by District policy. (Id., 68).

Plaintiff states that John Perachio sent letters to her regarding his concerns with her performance. (Plaintiff Dep., pp. 60-61). He wrote one letter to her regarding that a number of teachers told him that she was rude and intimidating during a workshop, and he encouraged her to keep in mind that they must work together. (Id.). Mr. Perachio also wrote to Plaintiff to address issues with her relationship with colleagues, failure to hold workshops and the requirement that she hand in lesson plans. (Id., pp. 60-63).

Plaintiff next refers to her Performance Appraisal for the 2001-02 school year as being unfair. She claims that she was upset by the Appraisal, and when she received it, ran to her office space and became hysterical. (Plaintiff Dep., pp. 65-66). Plaintiff pursued her grievance rights as afforded to her pursuant to the Collective Bargaining Agreement. The evaluation was carefully reviewed and ultimately upheld, with the exception of the recommendation that Plaintiff must substitute for absent teachers, by Henry Kelly, an Assistant Superintendent.

Plaintiff next points to John Perachio's actions in the subsequent school year, in which he sent her the revised Performance Appraisal and a letter in an envelope to her via hand delivery. (Plaintiff Dep., pp. 134-135). A school security person from Blackham School came into her classroom with the envelope and told Plaintiff that he was going downtown and that Mr. Perrachio had asked him to give it to her. (Id.). In the letter, Mr. Perachio asked her to call his

37

office to go over the evaluation and indicated that he would provide her with a Union representative if she wanted one. (Id.). Mr. Perachio also asked Plaintiff to hand in or send him information to verify her absence in June when she left school. (Id.). Plaintiff also relies upon Mr. Perachio's actions two weeks later, in which he asked the same security person to deliver another letter to her in which he requested that she call his office for an appointment to review the evaluation and again requested the documentation for her June 2002 absences. (Id.).

There can be no doubt that the evidence falls far short of establishing actions for hostile work environment in violation of Title VII. First, the incident of a letter of rejection for a Summer teaching position, which arrived in a recycled envelope, is an isolated incident and is clearly not serious enough to create, or lead to, a hostile work environment. Indeed, Plaintiff admits that the allegation was not asserted as an example of discrimination.

The record is clear that all that occurred during Plaintiff's tenure with John Perachio is that she was given certain performance requirements for her role as the Mathematics Resource Teacher in Blackham School, and her supervisor subsequently criticized her performance in areas which he deemed it was deficient. There were no surprises in Plaintiff's Performance Appraisal for the 2001-02 school year as it reiterated the criticism stated by Mr. Perachio when he was Plaintiff's supervisor. That Performance Appraisal was carefully reviewed and upheld in substantial part by the Assistant Superintendent who served in an oversight capacity when hearing Plaintiff's grievance.

38

Most notable is Plaintiff's testimony that she declined two Numeracy Coach assignments, after the resolution of her grievance regarding her transfer to a classroom assignment, because such Numeracy Coach assignments were in schools that would be new to her. Plaintiff emphasized in her deposition that she wanted to return to Blackham School and would do so even with John Perachio as the Principal.

Thus, the record is void of any evidence to support an inference that Plaintiff was subjected to a hostile work environment based upon actions of John Perachio. It establishes, at best, that Plaintiff may have been embarrassed or frustrated by his criticism, actions and/or Performance Appraisal.

Accordingly, the incidents asserted by Plaintiff are insufficient to establish a claim of hostile work environment in violation of Title VII, and judgment as a matter of law in favor of Defendants is warranted.

**D.    The Record is Void of Evidence to State a Claim for Intentional Infliction of Emotional Distress in Count Two**

Under Connecticut law, to state a claim for intentional infliction of emotional distress, "a plaintiff must allege that: (1) the defendant intended or knew that emotional distress would likely result from its conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused plaintiff distress; and (4) that plaintiff's distress was severe." *Abate v. Circuit-Wise, Inc.*, 130 F.Supp.2d 341, 348 (D. Conn. 2001)(citing *Appleton v. Board of Educ. of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059 (2000)); *Vorvis v. Southern New Eng. Tel.*

39

*Co.*, 821 F.Supp. 851, 855 (D. Conn. 1993)). *See also Johnson v. Chesebrough-Pond's USA Co.*, 918 F.Supp. 543, 552 (D. Conn. 1996), *aff'd*, 104 F.3d 355 (2d Cir. 1996) (citing *Petyan v. Ellis*, 200 Conn. 243, 253 (1986)).

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Johnson*, 918 F.Supp. at 552 (quoting 1 Restatement (Second), Torts § 46).

Further, it has been stated that "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Keene v. Hartford Hosp.*, 208 F.Supp.2d 238, 247-48 (D. Conn. 2002) (quoting *Hiers v. Cohen*, 31 Conn. Supp. 305, 329 A.2d 609 (1973)). *See also Hanson v. Cytec Industries*, No. 399 CV86, 2002 WL 519714, at * 5 (March 8, 2002)(Droney, J.)(stating that incidents complained of, although "distressing and hurtful" to the plaintiff, "are not matters which can be considered utterly intolerable in a civilized community").

The decision of the Connecticut Supreme Court in *Appleton*, 254 Conn. 210-11 is particularly relevant to the instant case. In *Appleton*, the plaintiff, a tenured teacher, claimed intentional infliction of emotional distress on the ground that one of the defendants made condescending comments to her in front of her colleagues, questioning her vision and ability to

40

read; telephoned the plaintiff's daughter and suggested that the plaintiff should take a few days

off; and telephoned the police to have her escorted out of the building to her car. Further, she

was subjected to two psychiatric evaluations, forced to take a suspension and a leave of absence

and forced to resign. *Id.* at 211.  The court stated that although "[t]hese occurrences may well

have been distressing and hurtful to the plaintiff . . . [t]hey do not . . . constitute extreme and

outrageous conduct . . ." *Id.*  The court held: "As the defendant's actions were not so atrocious

as to exceed all bounds usually tolerated by decent society, their conduct is insufficient to form

the basis of an action for intentional infliction of emotional distress." *Id.* at 212.

    In *Dollard v. Board of Education*, 63 Conn.App. 550, 552-53 777 A.2d 714 (2001), the

Connecticut Appellate Court held that the following facts were insufficient to support a claim of

intentional infliction of emotional distress:

> In 1998 and early 1999, the defendants jointly engaged in a concerted plan
> and effort to force the plaintiff to resign from her position [as a school
> psychologist] or to become so distraught that they would have a colorable
> basis for terminating her employment.  The defendants carried out their
> plan by hypercritically examining every small detail of her professional
> and personal conduct.

    In *Dollard*, the defendant transferred the plaintiff to a school to which she did not want to

be assigned, publicly admonished here for various behavior and placed her under the intense

supervision of a friend of one of the defendants.  Id. at 555.  Yet, the Court concluded that

"[w]hile the conduct alleged here may have been distressful and hurtful to the plaintiff, it was no

more extreme and outrageous that the conduct alleged in *Appelton*. Id.

41

In *Abate*, the plaintiff alleged that the actions of the defendant company in failing to correct the sexual abuse by his supervisor, and the outrageous conduct of his supervisor in sexually harassing him, constituted intentional infliction of emotional distress. The plaintiff alleged that the supervisor pinched the plaintiff's cheeks, held the plaintiff by his midsection, grabbed the plaintiff by his sides, touched the plaintiff with his genital area, as examples of unwelcome touching, and that the supervisor also subjected the plaintiff to highly offensive and unwelcome sexual comments. The plaintiff also alleged that he felt the company would not respond to his complaint, because he had heard of and witnessed past sexual harassment of other employees and visitors, and their complaints were not acted upon. *Abate*, 130 F.Supp.2d at 343-44. The court held that the plaintiff failed to allege conduct from which a reasonable jury would be permitted to infer that the defendant's conduct was sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress. *Id.*

Similarly, in *Johnson*, the court granted summary judgment in favor of the defendant on the ground that the defendant's alleged conduct, including the plaintiff's "sudden termination and being physically escorted from the building like a criminal" did not rise to the level of "extreme and outrageous" conduct. *Johnson*, 918 F.Supp. at 552-53. The *Johnson* court found that

> [a]t most, the alleged conduct establishes that Johnson was an at-will employee who was terminated because his direct supervisor believed his performance was unsatisfactory. While the methods by which Johnson's performance was reviewed and by which he was eventually terminated may not have been ideal employment practices, they did not constitute "extreme and outrageous" conduct.

42

*Id.* at 553. The plaintiff's claim was dismissed. *See also Thomas v. St. Francis Hosp. and Medical Ctr.*, 990 F. Supp. 81, 92 (D. Conn. 1998) *aff'd by*, 198 F.3d 235 (2d Cir. 1999) (no supportable claim although defendant intentionally made inappropriate comments to black female about her race, marital status and gender).

The record of evidence in the instant case falls far short of establishing creating a genuine issue of material fact as to whether Defendants' conduct was extreme and outrageous. Indeed, Plaintiff refers to only a few actions on behalf of some or all Defendants in support of her claim. Plaintiff first refers to her denial of a teaching position in the Gear Up Program for Summer 2001. (Plaintiff Dep., p. 121). She further relies on the fact that the letter of denial arrived in what she believed to be a recycled envelope and that she received the envelope in her mailbox at her home. (Id.). Plaintiff assumes that it was not mailed, but admits that she does not know whether her postman delivered it or whether it was placed in her mailbox. (Id.)

With specific regard to Defendant Sonia Salcedo, Plaintiff relies solely on Defendant's action in transferring Plaintiff to a classroom assignment. (Plaintiff Dep., p. 124). She offers no evidence of outrageous conduct on behalf of Dr. Salcedo or other individuals in effectuating the transfer; rather, she only cites to the decision. (Id.). The record is clear that Carole Pannozzo met with Plaintiff, Mary Walker and a BEA representative to inform them of the transfer, discuss options for a classroom assignment and provide the current vacancy list. Carole Pannozzo and Plaintiff subsequently discussed her interest in certain positions, and Plaintiff intimately informed Ms. Pannozzo of her decision to accept an assignment at Barnum School. The

43

evidence in no way supports a finding that Plaintiff was mistreated during the transfer process. To the contrary, the record in unequivocal that Plaintiff simply received notice of a meeting with Human Resources and that Carole Pannozzo handled the transfer situation with the utmost of professionalism and sought to work with Plaintiff to place her in a position of her choosing.

With respect to Defendant Kenneth Henrici, Plaintiff's claim is merely that he failed to follow through in handling her grievance and just stopped. (Plaintiff Dep., p. 126). The basis of her claim is her belief that "he dropped the ball . . ." (Id.). Plaintiff again makes no claim of extreme, outrageous, indecent conduct on behalf of Mr.Henrici.

With respect to Defendant Ricardo Rosa, Plaintiff claims that he did not hire her for the Summer 2001 Gear Up position when other Math Resource Teachers, two of whom are Hispanic and one Jewish, were hired. (Plaintiff Dep., p. 149). Again, even if true, Plaintiff offers no evidence of outrageous conduct on behalf of Dr. Rosa in the selection process for the Summer 2001 Gear Up Program. She received a single letter with Dr. Rosa's and Leroy Dupee's signature.

The letter at issue was in the nature of a short statement that her application had not been selected. As is the case with Plaintiff's claim of hostile work environment, the isolated incident of a letter of rejection, even if contained in a recycled envelope and received a few days later than normal, is clearly not evidence of outrageous conduct.

With respect to Defendant Jorge Pezo, Plaintiff offers only the substance of an e-mail exchange. (Plaintiff Dep., p. 127). Plaintiff states that she called Mr. Pezo to request that he tell

44

Dr. Rosa that she would like to leave the regular Mathematics staff meeting early because she had Gear Up that same afternoon. (Id., p. 128.) Mr. Pezo responded to the e-mail, saying: "Gear Up, no problem. Dr. Rosa did not like the last time when people left the meeting early. You are to have the students wait outside until you return from the meeting or schedule Gear Up on a Friday –Thursday or Friday." (Id.) Plaintiff states that she e-mailed Mr. Pezo back to inform him that she had high school tutors working in the Gear Up Program. The students had jobs and did not like to work on Thursdays or Fridays, and Plaintiff did not want students standing outside of a building unsupervised, waiting for an after school program. (Id.) Plaintiff offers no evidence to even contend that Mr. Pezo responded to maintain his initial position, let alone said anything outrageous in nature. Rather, she states in conclusory fashion that his e-mail with those instructions to her is the basis for her emotional distress claim.

Indeed, Plaintiff provides no basis for her characterization of Defendants' actions as egregious other than that she was distressed by them and suffered losses that resulted from her failure or refusal to seek after-school and summer employment subsequent to the denial of the Summer 2001 position. Thus, her conclusion is based solely on her own emotional state. Such a conclusory determination does not support a finding that Defendants' actions constitute the "egregious conduct" required to support a claim of intentional infliction of emotional distress in the employment context. *Parsons v. United Techs Corp.*, 243 Conn. 66, 88-89; *Rosenberg v. Meriden Housing Authority*, No. CV95 0377376, 1999 WL 1034611, (Conn. Super. Oct. 29, 1999) (Licari, J.) (copy attached).

45

Thus, the record is clear that the conduct of any of these Defendants is not "so extreme in degree, as to be beyond all possible bounds of decency . . . ." Plaintiff does not even present any conduct by any Defendant that could be described as "insults, indignities, threats, annoyances, [or] petty oppressions," which are <u>not</u> enough to state a claim for intentional infliction of emotional distress. *See Keene*, 208 F.Supp.2d 247-48.  Likewise, Defendants' alleged actions herein do not rise to the level of the defendants' actions in *Dollard*, *Abate* and *Johnson*, which did <u>not</u> constitute "extreme and outrageous" conduct.  Even if viewed in a light most favorable to Plaintiff, no one conducted himself or herself, or treated Plaintiff, in a manner that would cause a reasonable person to exclaim, "Outrageous!"

Accordingly, Plaintiff's claim for intentional infliction of emotional distress in Count Two is legally insufficient and the Court should grant judgment as a matter of law in favor of Defendants Sonia Diaz Salcedo, Kenneth Henrici, Ricardo Rosa and Jorge Pezo.

### E.    Plaintiff Fails to State a Claim for Negligent Infliction of Emotional Distress in Count Three

Plaintiff claims that all Defendants, including Sonia Diaz Salcedo, Kenneth Henrici, Ricardo Rosa and Jorge Pezo, caused her emotional distress, "which included mental, physical and emotional harm, loss of sleep, damage to her self-esteem, damage to her relationships with her family and friends and anxiety caused by the financial hardships to which she was subsequently, yet needlessly subjected." (Compl., Count Three, ¶ 24.)  Plaintiff alleges that such

46

emotional distress resulted from "the alleged conduct by the Board, as well as the co-defendants." (Id., ¶ 22.)

**1.  Plaintiff's Claim Fails Since Defendants' Alleged Actions Were Not in Connection With Termination of Her Employment**

In *Perodeau*, the Supreme Court of Connecticut concluded "that an individual municipal employee may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment." *Perodeau*, 259 Conn. at 762-63, 792 A.2d 752. *See also Gomez-Gil v. University of Hartford*, 63 F.Supp.2d 191, 194 (D. Conn. 1999); *Abate*, 130 F.Supp.2d at 346 (finding that under Connecticut law, "a claim for negligent infliction of emotional distress in the employment context arises only when it is based on unreasonable conduct of the defendant in the termination process," and dismissing the plaintiff's claim).

There is no dispute in the instant case that Plaintiff's employment was never terminated. (*See*, e.g. Complaint).  Rather, Plaintiff's claims are based on her denial of a teaching position and on her work environment, including her transfer to a classroom assignment.  While the Second Circuit Court of Appeals has expressed, *in dictim*, doubt as to whether the Connecticut Supreme Court would continue to limit an action for negligent infliction of emotional distress to actions taken in the course of an employee's termination, this Court has made clear that it "has consistently held in employment cases that a state law claim for negligent infliction of emotional

47

distress arises only in the context of a termination." *Abate*, 130 F.Supp.2d 346 (citations omitted).

        **2.**      **The Record is Void of Evidence to Establish Conduct That Would Cause a Reasonable Person to Suffer Emotional Distress That Might Result in Illness or Bodily Harm**

Even if Plaintiff may maintain an action for negligent infliction of emotional distress, the record of evidence fails to establish the required elements of such a claim. "An individual making an emotional distress claim must show that a *reasonable person* would have suffered 'emotional distress . . . that . . . might result in illness or bodily harm.'" *Perodeau*, 259 Conn. at 755, 792 A.2d 752 (quoting *Montinieri v. Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978)). The *Perodeau* court examined "the normal expectations of individuals in the context of an ongoing employment relationship," and stated:

> It is clear that individuals in the workplace reasonably should expect to be subject to routine employment-related conduct, including performance evaluations, both formal and informal; decisions related to such evaluations, such as those involving transfer, demotion, promotion and compensation; similar decisions based on the employer's business needs and desires, independent of the employee's performance; and disciplinary or investigatory action arising from actual or alleged employee misconduct. In addition, such individuals reasonably should expect to be subject to other vicissitudes of employment, such as workplace gossip, rivalry, personality conflicts and the like. Thus, it is clear that individuals in the workplace should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace. There are few things more central to a person's life than a job, and the mere fact of being demoted or denied advancement may be extremely distressing. That is simply an unavoidable part of being employed.

48

*Perodeau*, 259 Conn. at 757, 792 A.2d 752.

In her deposition, Plaintiff stated a list of reasons in support of her claims of emotional distress. As described above with respect to Count Two, Plaintiff states: that she was denied a teaching position in the Gear Up Program for Summer 2001 and that the letter of denial arrived in what she believed to be a recycled envelope. (Plaintiff Dep., p. 121). Further, Plaintiff assumes that the envelope was placed in her mailbox rather than mailed since although it had a postmark she did not receive it for seven days. (Id. at 123).

Plaintiff further points to her involuntary transfer by Defendant Salcedo, Defendant Henrici's presumed failure to resolve her grievance, Defendant Rosa's alleged failure to hire her for the Summer 2001 position and Defendant Pezo's response to her e-mail regarding leaving early from a regular Math Department meeting as the basis for her claim.

However, such denial, transfer and communications are consistent with "routine employment-related conduct" described in *Perodeau* that all employees reasonable should expect and which are not actionable.

Indeed, this Court overturned a jury verdict for plaintiff on a claim of negligent infliction of emotional distress based on allegations similar to those in the present case -- that the employer violated federal law when it denied an employee's requested accommodation after a month of the plaintiff inquiring on a daily basis whether a decision had been made. *Hernandez v. City of Hartford*, 30 F. Supp. 2d 268, 273 (D. Conn. 1998). The Court stated: "In other words, it was not reasonable for defendant to foresee that its handling of a personnel matter such as this – even

if the jury found that defendant acted badly in its denial -- would involve an unreasonable risk of causing mental distress to plaintiff that might result in serious illness or bodily harm . . . Defendant's behavior was not unreasonable as a matter of law. " *Id.* Likewise, in *Mendes v. Jednak*, 92 F.Supp.2d 58,64 (D. Conn. 2000), the Court granted summary judgment in favor of the employer since there was no evidence that the defendant's conduct in sending the plaintiff a termination letter after seventeen weeks and refusing to reinstate her was outrageous or involved an unreasonable risk of causing emotional distress that might result in illness or bodily harm.

### 3.   The Record is Void of Evidence to Establish Foreseeability

"In negligent infliction of emotional distress claims, unlike general negligence claims, the foreseeability of the precise 'nature of the harm to be anticipated [is] a prerequisite to recovery even where a breach of duty might otherwise be found . . . .'" *Perodeau*, 259 Conn. at 754 (quoting *Maloney v. Conroy*, 208 Conn. 392, 398, 545 A.2d 1059 (1988)); *Morris v. Hartford Courant Co.*, 200 Conn. 676, 683, 513 A.2d 66 (1986).   The foreseeability required is a realization by a defendant that his or her conduct involves "an unreasonable risk of causing emotional distress *and* that the distress, if it were caused, might result in illness or bodily harm." *Maloney*, 208 Conn. at 398, 545 A.2d 1059.

In the instant case, Plaintiff's allegation in this regard is merely that "[t]he defendant and co-defendants knew or should have known that their harassment of the plaintiff involved an unreasonable risk of causing distress." (Compl., Count Three, ¶ 23.)  However, Plaintiff offers no evidence to support a finding that any of Defendants should have realized that their conduct

involved an unreasonable risk of causing emotional distress and that that distress, if caused, might result in illness or bodily harm.

The record is unequivocal that Plaintiff was not discharged. Plaintiff continues to be employed by the Board. She was denied a position in the Summer 2001 Gear Up Program and subsequently transferred to a classroom assignment. The evidence does not establish conduct of Defendants sufficient to support such a claim. Accordingly, Plaintiff's claim for negligent infliction of emotional distress in Count Three is legally insufficient, and the Court should grant judgment as a matter of law in favor of Defendants Sonia Diaz Salcedo, Kenneth Henrici, Ricardo Rosa, Jorge Pezo and the Board of Education.

## IV.    CONCLUSION

For the foregoing reasons, Defendants Bridgeport Board of Education, Sonia Diaz Salcedo, Kenneth Henrici, Ricardo Rosa and Jorge Pezo, respectfully request this Court to grant summary judgment in favor of Defendants on each count of the Corrected Amended Complaint.

Done at Bridgeport, Connecticut, this 17th day of March, 2004.

_Lisa M. Grasso_
LISA M. GRASSO, ESQ.
Federal Bar No. ct03768
DURANT, NICHOLS, HOUSTON,
HODGSON & CORTESE-COSTA, P.C.
1057 Broad Street
Bridgeport, CT 06604
(203) 366-3438
ATTORNEYS FOR DEFENDANTS
SONIA DIAZ SALCEDO, KENNETH HENRICI,
RICARDO ROSA & JORGE PEZO

## CERTIFICATION

I hereby certify that a copy of the foregoing was caused to be filed this 17th day of March

2004, via U. S. Mail, Certified Mail, Return Receipt Requested, to the following counsel and pro

se parties of record:

W. Martyn Philpot, Jr., Esq.
Law Office of W. Martyn Philpot, Jr., LLC
409 Orange Street
New Haven, CT  06511

Lisa M. Grasso

P:\lit\LMG\091200\377\00038853.DOC